KICKAPOO TRIBE OF OKLAHOMA, on behalf of themselves and as parens patriae, Traditional Council of the Texas Band of Kickapoo, on behalf of themselves and as parens patriae, Isidro Salazar, Debra Garcia, and Irene Garza Spoon, Plaintiffs,

v.

Manuel LUJAN, Secretary of the Interior, and William Ragsdale, Assistant Secretary of the Interior–Indian Affairs, Defendants.

Civ. A. No. 89–2052 SSH.

United States District Court, District of Columbia.

Jan. 19, 1990.

Harold M. Gross and Marsha Kostura, Washington, D.C., for plaintiffs.

James M. Upton, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss. Plaintiffs seek to enjoin defendants from recognizing and dealing with a newly-created independent Texas Band of Kickapoo Indians. For the reasons set forth below, plaintiffs' motion is denied, defendants' motion is granted, and the case is dismissed.

### Background

The Kickapoo Indians migrated south from present-day Wisconsin and Illinois in the early part of the nineteenth century, eventually settling in Oklahoma, Texas, and Mexico. The Kickapoo Tribe of Oklahoma has been a federally-recognized tribe since 1937, pursuant to the Oklahoma Indi-

an Welfare Act, 25 U.S.C. § 503. The Texas Band, however, did not gain federal recognition until 1983 when, under the Texas Band of Kickapoo Act, the Band was recognized as a subgroup of the Kickapoo Tribe of Oklahoma. 25 U.S.C. §§ 1300b–11 through 1300b–16.

Despite their geographic separation, the Oklahoma Tribe and what eventually became the Texas Band have maintained a close relationship through migration, intermarriage, and their tribe/subgroup status. In fact, the two groups worked together in urging Congress to pass the Texas Band of Kickapoo Act. Prior to the Act's passage, the group residing in Texas lived under intolerable living conditions and was ineligible for federal services. Under the Act, the group gained recognition as American Indians and status as a subgroup of the Oklahoma Tribe, and became eligible for federal services. On March 8, 1984, the Oklahoma Tribe passed Tribal Resolution No. K–84–3, which provided for a Texas Band of Kickapoo Committee to serve for a two-year period as spokespersons for the Band and as an advisory board to the Oklahoma Tribe. The Traditional Council of the Texas Band of Kickapoo then passed its own by-laws on April 27 and May 11, 1985.

On January 23, 1989, the Traditional Council (referred to by plaintiffs as the "Texas faction") submitted a draft constitution for the "Kickapoo Traditional Tribe of Texas" to the Bureau of Indian Affairs (BIA) for review pursuant to Section 16 of the Indian Reorganization Act, 25 U.S.C. § 476.[1] On April 20, 1989, however, the Business Committee of the Oklahoma Tribe appointed a new Traditional Council for the Texas Band, "for the purpose of reevaluating the directives and objectives of the Texas Band of Kickapoo." Tribal Resolution K–89–26, April 20, 1989. On April 21, 1989, after several levels of agency review of the proposed constitution, the Deputy to the Assistant Secretary for Indian Affairs authorized the Anadarko Area Director to call the Secretarial election to seek rat-

---

1. In the Texas Band of Kickapoo Act, Congress made Section 16 of the Indian Reorganization Act applicable to the Band. *See* 25 U.S.C. § 1300b–14. The January 23 draft was the second draft submitted. An initial draft had been submitted on October 21, 1988.

ification of the proposed constitution. The election was set for May 27, 1989.

On May 6, 1989, the new Traditional Council informed the BIA by Tribal Resolution that the Council did not wish to separate and form an independent tribe, but rather wished to have a five-year transition period to study the option. This Council also submitted a new constitution and asked that a Secretarial election be called for ratification. The BIA acknowledged receipt of the documents but did not cease preparations for the May 27 election that had initially been requested. The Oklahoma Tribe filed an appeal with the Secretary on May 8, 1989, alleging irregularities in the election registration process. The Secretary denied the appeal on May 19, 1989. The Tribe then requested reconsideration of the decision, but the request was denied on May 25.

The Secretarial election was held on May 27, 1989, and the Band voted in favor of adopting the proposed constitution, casting 132 votes for and 15 votes against adoption. Two timely challenges to the election were filed pursuant to BIA regulations, 25 C.F.R. § 81.22 (1988), but both were reviewed and denied. On July 7, 1989, the Oklahoma Tribe requested that the BIA disapprove the election and constitution, alleging various irregularities in the election process. Nevertheless, on July 11, 1989, the Secretary certified the election results and approved the Band's proposed constitution.

## Discussion

### A. Standing

■ Defendants argue that the Oklahoma Tribe must be dismissed as a plaintiff because the Tribe lacks standing. The Tribe asserts standing on the basis of its significant sovereignty interest, and under the doctrine of *parens patriae* on behalf of some of its own members and on behalf of all of the Texas Band members. The Court, taking as true all material allegations of the complaint, agrees with defendants that the Oklahoma Tribe lacks standing, and that it must therefore be dismissed as a plaintiff.

Article III of the Constitution of the United States requires a plaintiff to allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 *reh'g denied*, 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984). In addition to the constitutional requirements, there are certain prudential considerations to which federal courts have adhered. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). Among these prudential concerns, the Supreme Court has required "that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* at 475, 102 S.Ct. at 760 (*citing Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). This prudential concern "remains a firm requirement of the law of this circuit," *Autolog Corp. v. Regan*, 731 F.2d 25, 29 (D.C.Cir.1984), and "'seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives.'" *American Postal Workers Union, AFL–CIO v. United States Postal Service*, 891 F.2d 304, 310 (D.C.Cir.1989) (*citing Clarke v. Securities Industry Association*, 479 U.S. 388, 397 n. 12, 107 S.Ct. 750, 756, n. 12, 93 L.Ed.2d 757 (1987)). The Court finds that the Oklahoma Tribe's complaint does not fall within the zone of interests protected by Congress in passing the relevant statutes.[2]

In the Texas Band of Kickapoo Act, Congress made § 16 of the Indian Reorganization Act applicable to the Texas Band. 25 U.S.C.A. § 1300b–14(a). Under § 16, tribes are given the option to reorganize their tribal governments by adopting new tribal

---

2. Because the Court finds that the Oklahoma Tribe does not meet the zone of interests requirement, the Court does not reach the question of whether the Tribe meets the constitutional standing requirements.

constitutions. 25 U.S.C.A. § 476. In 1988, Congress amended § 16 and provided: "Actions to enforce the provisions of this section may be brought in the appropriate Federal district court." 25 U.S.C.A. § 476(d)(2). By enacting this provision, Congress consciously waived the United States' sovereign immunity and consented to suit. However, "[i]t is elementary that when consent to sue the United States is granted, the precise terms, conditions, and qualifications of such consent must be scrupulously followed." *Coleman v. United States Bureau of Indian Affairs,* 715 F.2d 1156, 1161 (7th Cir.1983). Thus, Congress may prescribe the specific procedures to be followed, the specific tribunal to be invoked, and the specific remedies to be pursued.

Congress may also prescribe the particular parties who have standing to bring suit against the United States. "Where ... Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff." *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Although the statute reads merely "[a]ctions ... may be brought....", and is unclear on its face as to who may bring them, the legislative history of the 1988 amendments to the IRA makes clear that Congress consented to suit only by the tribe submitting its proposed constitution for ratification by the tribe and approval by the Secretary under the IRA.[3] Both the Senate and

House Reports state that "[t]he tribe also has the right to challenge any finding made by the Secretary as to the legality of a proposed tribal document in the appropriate Federal court." S.Rep. No. 577, 100th Cong., 2d Sess. 2 (1988); H.R.Rep. No. 453, 100th Cong., 1st Sess. 3 (1987). Taken in the context in which it was written, it is clear to this Court that Congress was referring to the tribe requesting the election.[4]

The Court disagrees with plaintiffs' argument in their supplemental brief that "[r]arely, if ever, would a *tribe requesting* an election or proposing a constitution sue the Secretary to challenge the election." (Emphasis in original.) On the contrary, a requesting tribe could bring suit whenever the Secretary disapproved the constitution on grounds that it was contrary to applicable law. Or, a requesting tribe could bring a suit to enforce the time limitations imposed upon the Secretary by Congress. The Court finds nothing to suggest, however, that in amending the IRA, Congress was consenting to suit by "other affected factions or groups," as plaintiffs posit. Such a construction would open the door to needless litigation by any related, neighboring, or other tribe somehow affected by the new tribe's status, frustrating the original intent of the IRA, "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism," H.R.Rep. No. 1804, 73d Cong., 2d Sess. 6 (1934), and "to disentangle the tribes from the official bureaucracy." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 153, 93 S.Ct. 1267, 1273, 36 L.Ed.2d 114 (1973). Thus, this construction would be so "inconsistent with the purposes implicit in the

---

**3.** When a statute is ambiguous, the Court may resort to the legislative history to determine legislative intent. *See United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Communications Systems, Inc. v. FCC,* 595 F.2d 797, 799–800 (D.C.Cir.1978). In fact, the Supreme Court consulted the legislative history in *Clarke,* 479 U.S. at 401–403, 107 S.Ct. at 758–759, when it ruled that the plaintiff satisfied the zone of interests test.

**4.** Specifically, in the relevant paragraphs of the Reports, the House and Senate Committees re-

fer to "the draft tribal document" and "a tribally requested election." When later in the paragraphs they refer to "[t]he tribe", common sense and proper syntax require the interpretation that all forms of "tribe" refer to the same tribe, namely, the one requesting an election.

In another paragraph of the House Committee Report, the Committee states that the newly-amended IRA gives "the appropriate party" the right to sue. Again, the Court concludes that taken in context, "the appropriate party" must be considered to be the requesting tribe.

statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757.

The Court does not deny that the Kickapoo Tribe of Oklahoma has an interest in the status and well-being of the Texas Band.[5] The history of the relationship between the two entities bears out this interest. The Secretary and the BIA acknowledged this interest and accordingly informed the Tribe of the Band's reorganization status.[6] It was the intent of Congress, however, that the newly-amended IRA "be available to all Indian tribes which have previously organized under the 1934 Act or are eligible to organize under such Act." H.R.Rep. No. 453, 100th Cong., 1st Sess. 3 (1987). And in the Texas Band of Kickapoo Act, Congress specifically made the Texas Band eligible to reorganize under the IRA.[7] 25 U.S.C.A. § 1300b–14(a).

Plaintiffs argue that even if the Band were eligible to organize separately, the Traditional Council that submitted the draft constitution was ineligible to act on behalf of the Band, because the members' terms had expired and because the Council had no authority to speak for the Band without the approval of the Tribe. However, even though the formal terms of office for the members of the Traditional Council may have run, the Tribe continued to deal with that Council as spokespersons for the Band. The Tribe did not appoint a new Traditional Council until April 20, 1989, well after the draft constitution had already been submitted for the Secretary's approval.

■■ The Tribe also asserts that it has standing under the doctrine of *parens patriae,* on behalf of some of its own members, who are both Oklahoma Tribe members and Texas Band members, and on behalf of the Texas Band members. This doctrine allows a sovereign to bring an action on behalf of the interests of all of its citizens, *Louisiana v. Texas,* 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900), and has been used to allow states to recover damages to quasi-sovereign interests, such as "the 'health, comfort, and welfare' of the people, interstate water rights, pollution-free interstate waters, protection of the air from interstate pollutants, and the general economy of the state." *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1089 (2d Cir.1971). However, this theory fails here because a sovereign tribe must be acting on behalf of all of its members in order to litigate as *parens patriae. Assiniboine & Sioux Tribes v. Montana,* 568 F.Supp. 269, 277 (D.Mont.1983). While all members of the Tribe may be in some way affected by the Band's reorganization, the Tribe would not be representing the interests of all members as the doctrine of *parens patriae* requires.

■ The Oklahoma Tribe also cannot rely on third-party standing, asserting the rights and alleged injuries of the members of the Texas Band. A party generally cannot rely on the rights and interests of third-parties to state a claim. *Warth v.*

---

**5.** The Court will continue to refer to the newly formed Kickapoo Traditional Tribe of Texas as the Texas Band, in an effort to avoid confusion.

**6.** The BIA also recognized, however, that "the Tribe does not represent the Band in the reorganization process." *See* Plaintiffs' motion and memorandum in support of motion for preliminary injunction, Exhibit 4.

**7.** It seems to the Court that the eventual separation of the Band from the Tribe was contemplated and should not have come as a surprise to the Tribe. For example, in the Band's August 1988 contract application, Objective Three begins: "Provide basic tribal administrative services (personnel and supplies) so that the Texas Band of Kickapoo can continue to develop its own identity separate from the Kickapoo Tribe of Oklahoma...." *See* Federal defendants' notice of motion and motion to dismiss, Exhibit 2, p. 4.

Plaintiffs acknowledge that "[w]hether or not the Texas Band is to be a separate entity is not at issue. The Tribe's concern lies with how, when, and under what authority the separation will occur." Plaintiffs' motion at 24 n. 24. While plaintiffs may have an interest in the well-being of the Band during this transition period, it does not have standing to sue now that the Band has separated. The Tribe is understandably paternalistic, but seems to be saying that it only wants the Band to separate if it is done pursuant to conditions set out by the Tribe.

*Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Although this rule has been relaxed in appropriate circumstances, it must be applied to a case such as this where the interests of at least some members of the Band conflict with the interests the Tribe claims to assert on their behalf.[8] The vast majority of Band members voted to ratify the new constitution as submitted by the Traditional Council.[9] To allow the Tribe to litigate on behalf of the Band would be highly unfair to certain Band members.[10]

### B. *Indispensable Party*

Defendants argue further that the case must be dismissed because the Kickapoo Traditional Tribe of Texas (formerly the Texas Band) is an indispensable party to the lawsuit but cannot be joined as a party due to its tribal immunity. The Court agrees.

■ The Court concludes that under Rule 19(a) of the Federal Rules of Civil Procedure the Texas Band is a "necessary" party and so must be joined in this action, if feasible. Specifically, the Court first finds that in the Band's absence, "complete relief cannot be accorded among those already parties." Rule 19(a)(1). Even were the Tribe to succeed in this lawsuit, the judgment would have little or no effect on the Texas Band, which would undoubtedly continue to assert its separate existence. Second, the Court finds that the Texas Band has "an interest relating to the subject of the action and is so situated that the disposition of the action in the [Band's] absence may … as a practical matter impair or impede the [Band's] ability to protect that interest…." Rule 19(a)(2)(i). By submitting a proposed constitution and re-

questing an election, the Traditional Council was exercising its reorganization rights as conferred by Congress. When the Secretary approved the constitution and certified the election results, the Texas Band became a sovereign and now has an interest in protecting its own sovereignty. A judgment against defendants in this action would impair the Texas Band's ability to protect that interest. As explained above, the Oklahoma Tribe has interests which conflict with the sovereignty interest of the Band, and so cannot represent the Band's interest in this lawsuit. Finally, if the Band is not present to represent its own interests in this lawsuit and the plaintiffs succeed, the Secretary would face the probability of another lawsuit, brought this time by the Texas Band. *See* Rule 19(a)(2)(ii).

■ Although the Texas Band is a necessary party to this action, it is not feasible to join the Band as a party. Indian tribes are immune from suit under the doctrine of sovereign immunity, unless the tribe consents to be sued or there is clear legislative intent to waive tribal immunity. *See Puyallup Tribe, Inc. v. Department of Game of Washington,* 433 U.S. 165, 172–73, 97 S.Ct. 2616, 2621–22, 53 L.Ed.2d 667 (1977); *Seneca–Cayuga Tribe v. State ex rel. Thompson,* 874 F.2d 709, 715 (10th Cir. 1989); *Wichita and Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 771 (D.C.Cir.1986). In this case, there is no indication that the Texas Band is willing to waive its sovereign immunity and consent to be sued or that Congress has waived the Band's tribal immunity. Thus, the question becomes whether the Texas Band is not only a necessary party, but an indispensable party as well. *See* Rule 19(b).

8. The Court here analogizes to cases which have held that when the members of an association hold divergent views on an issue, or have conflicting interests, individual participation in a lawsuit is necessary, and the association may not rely on third-party standing. *See, e.g., Harris v. McRae,* 448 U.S. 297, 321, 100 S.Ct. 2671, 2690, 65 L.Ed.2d 784, *reh'g denied,* 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980); *Associated General Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 691 (8th Cir.1979).

9. Even if, as plaintiffs allege, there were irregularities in the voter registration and election processes, plaintiffs provide no evidence that all Band members dispute the election result. Presumably there are at least some Band members who support the new constitution.

10. The Court need not reach the standing question as to the four remaining plaintiffs, in light of the Court's determination on the indispensable party issue.

■ The Court must determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent party being thus regarded as indispensable." Rule 19(b). "In general, 'indispensable parties' are those persons who not only have a direct and tangible interest in the controversy, but also those whose interest would necessarily be affected in such a way by the judgment that it would be inequitable to proceed without them." *Harjo v. Kleppe*, 420 F.Supp. 1110, 1117 (D.D.C. 1976), *aff'd*, 581 F.2d 949 (D.C.Cir.1978). Rule 19(b) sets forth four factors, among others, for the Court to consider: (1) the prejudice to the relevant person or to those who are already parties to the action; (2) the extent to which the prejudice can be lessened or avoided by means less severe than dismissal; (3) the adequacy of a judgment rendered in the person's absence; and (4) whether the plaintiff will have an adequate remedy if the case is dismissed.

There is no doubt that the Texas Band will be prejudiced by a decision rendered in its absence. As stated above, the Band has elected to reorganize and establish itself as a separate sovereign. Plaintiffs challenge the government's recognition of the Band as a sovereign. To allow this litigation to proceed in the Band's absence would promote the worst kind of paternalism and seriously undermine the Band's interest in its own survival. After all, the Band really is the subject at the center of this litigation. Of course, there are times when prejudice to an absent party can be eliminated or at least mitigated by the presence of a party in the action who can represent the absent party's interests. *Wichita*, 788 F.2d at 774. In this case, however, the Court does not believe that the government will adequately represent the interests of the Band. The Secretary has an interest in defending agency actions and authority with respect to tribal reorganization. The Texas Band, however, has an interest in its own survival, an interest which it is entitled to protect on its own. And, again, if the Band is unable to represent itself in this action and the plaintiffs were to obtain a favorable judgment, the Band likely would bring a new lawsuit against the Secretary. After all, in considering the adequacy of the judgment, the Court must consider "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies," *Provident Tradesmens Bank & Trust Company v. Patterson*, 390 U.S. 102, 111, 88 S.Ct. 733, 739, 19 L.Ed.2d 936 (1968), and in this case, further litigation could be anticipated.

It is difficult to see how the Court could shape relief so as to avoid prejudice to the Texas Band. The fact of the matter is that in this case the real party at issue is missing. Without that party present to represent its interests, the Court could not in good conscience fashion a remedy without affecting the rights of the Band. *See Wichita*, 788 F.2d at 776.

Plaintiffs argue that if they are precluded from bringing an action in the absence of the Band, they will be without a forum in which to assert their claims, noting that the Texas Band does not have a tribal court system.[11] However, our Court of Appeals in *Wichita*, while recognizing that a court should be "extra cautious in dismissing a case for nonjoinder" where the plaintiff otherwise may be without an adequate remedy, went on to conclude that where the dismissal of a suit was mandated by tribal immunity, the result was "less troublesome." *Id.* at 777. The Court reasoned that the dismissal was based on society's policy choice to grant sovereign immunity to Indian tribes, rather than on a procedural defect, and suggested that that policy was strong enough to outweigh plaintiff's interest in having an available forum. *Id.*

Having weighed the relevant factors, the Court concludes that the Texas Band is an indispensable party, and that the case must be dismissed for nonjoinder.

---

11. The Constitution of the Kickapoo Traditional Tribe of Texas does list as an enumerated power of the Traditional Council the power "[t]o pro-vide for the administration of justice by establishing tribal courts." Article VII, section o.