Vernon **MASAYESVA**, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe, Plaintiff,

v.

Peterson **ZAH**, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe, Defendant,

v.

Evelyn **JAMES**, et al., Intervenors.

**THE NAVAJO NATION**, Plaintiff,

v.

**THE UNITED STATES OF AMERICA**, et al., Defendants.

Nos. Civ 74–842 PCT EHC, Civ 90–666 PCT EHC.

United States District Court, D. Arizona.

March 13, 1992.

James E. Scarboro, David C. Warren, Mary Gabrielle Sprague, Arnold & Porter, Denver, Colo., for plaintiff.

Terry E. Fenzl, Charles S. Price, Randolph H. Barnhouse, Brown & Bain, P.A., Phoenix, Ariz., and Joe Patterson, Navajo Nation, Dept. of Justice, Window Rock, Ariz., for defendant.

K. Jerome Gottschalk, Robert M. Peregoy, Edgar T. Bristow, Boulder, Colo., for intervenors.

Linda A. Akers, U.S. Atty., District of Arizona, James P. Loss, Asst. U.S. Atty., Phoenix, Ariz., for U.S.

## ORDER

CARROLL, District Judge.

On December 11, 1989, the Bureau of Indian Affairs ("BIA") of the Department of Interior ("Interior"), issued its notice of final determination that the San Juan

Southern Paiute Tribe ("the Paiutes" or the "Paiute Tribe") exists as an Indian tribe within the meaning of Federal law.[1] The BIA found that the Paiute Tribe met all of the criteria set forth in 25 C.F.R. § 83.7[2] which are necessary for a government-to-government relationship with the United States.

Among other things, a group of Indians petitioning for recognition must demonstrate that it is "composed principally of persons not members of any other North American Indian Tribe." 25 C.F.R. § 83.-7(f). The Navajo Nation[3] contends that a majority of the persons claiming to be members of the Paiute Tribe are actually members of the Navajo Nation and that the Paiutes therefore do not meet the above criteria.

To determine whether the Paiutes were members of the Navajo Nation, the BIA applied the standard set forth in § 83.1(k) to determine membership:

[1][a] "Meets the membership requirements of the tribe as set forth in its governing document" or

[b] "is recognized collectively by those persons comprising the tribal governing body," and

[2][a] "has continuously maintained tribal relations with the tribe" or

[b] "is listed on the tribal rolls of the tribe as a member, if such rolls are kept."[4]

To meet this definition, an individual must fulfill at least one subpart in both section [1] and [2].

Since 119 Paiutes (63% of the Paiute Tribe) had Navajo census numbers, whether those people were members of the Navajo Nation was critical in the determination of whether the Paiute group was an existing tribe. In its proposed final determination, the BIA found that the Paiutes did not meet part [1] of the membership requirements of the Navajo Nation, as those requirements were too ambiguous to determine whether the Paiutes fulfilled them and there was no evidence of collective acceptance of the Paiutes by the Navajo Nation.

However, in the final determination, the BIA explicitly disclaimed its reliance on these findings, and chose to rely instead on its conclusion that part [2] was not met. The BIA found that the majority of the Paiutes were not members of another Indian tribe because the Paiutes with Navajo census numbers had not continuously maintained tribal relations with the Navajo Nation and were not listed on a "tribal roll." The final determination also found that the Navajo Nation had not exercised influence over internal political processes within the Paiute membership and that the Paiutes had not been involved extensively in the Navajo political process. This latter finding is not disputed by the Navajo Nation.

The real issue in contention is whether the Paiutes listed on the Navajo census were listed on a "tribal roll." The BIA found that the Navajo census, the membership roll of the Navajo Tribe, was not a "tribal roll" within the meaning of the acknowledgment regulations.

---

**1.** Congress has also ratified the determination by appropriating "new tribes" monies for the Paiute Tribe.

**2.** 25 C.F.R. § 83.7 requires that a group petitioning the BIA for recognition as an Indian tribe must, in summary, (1) demonstrate "the group's substantially continuous Indian identity", (2) demonstrate that the group lives in an area or community "viewed as American Indian" and that "its members are descendants of an Indian tribe which historically inhabited a specific area", (3) demonstrate that the petitioner has authority over its members as an "autonomous entity through history", (4) present a copy of the governing document or a statement regarding membership criteria and governance, (5) pro-

duce a list of all known current members, (6) demonstrate that the "membership of the petitioning group is composed principally of persons who are not members of any other North American Indian tribe", and (7) the members are not subject of legislation terminating or forbidding the Federal relationship.

Only factor (6) is at issue in this case.

**3.** The Navajo Tribal Code, 1 N.T.C. § 301, requires the use of the name "Navajo Nation" rather than "Navajo Tribe".

**4.** This opinion divides the criteria in § 83.1(k) in such a manner to allow reference to each phrase.

The census list was created in 1928 when the BIA took a census of all Indians living on the Navajo reservation at the time. Another census was taken in 1940, which was updated at various times. In 1953, the Navajo adopted the 1940 census as its official roll, and in the 1980's (the exact date was not provided), the Navajo Nation contracted with the BIA to update the roll. The census contained both Navajo and non-Navajo Indians.

The Navajo Tribal Code provides for a process to establish an official Tribal Roll, including an enrollment application process and evaluation by an Enrollment Screening Committee. This process has never been used to establish a Tribal Roll, and the tribe has instead concentrated on the upkeep of the BIA census. The BIA found that "there is little evidence to show that this roll is a tribal roll in the sense that it is exclusively a list of Navajo tribal members within the meaning of the acknowledgment regulations."

The determination was based in part on the finding that the Paiute presence on the Navajo census was not evidence of a "bilateral political relationship," i.e. presence on the census was not evidence that the Paiutes intended to be part of the Navajo Nation. The Associate Solicitor for the Department of Interior opined in 1987 that in order for a membership list to be a "tribal roll" within the meaning of the regulations, "the list of members should be one that was prepared under circumstances indicating strongly that it represents a list of those maintaining tribal relations." Assistant Solicitor Keep in 1988 stated, "while it is a fundamental principle that a tribe's membership is for the tribe to decide, that principle is dependent and subordinate to the more basic principle that membership in an Indian tribe is a bilateral political relationship ... a tribe does not have authority, under the guise of determining its own membership, to include as members persons who are not maintaining some meaningful sort of political relationship with the tribal government."

In summary, because the Paiutes with census numbers did not acquire them with the intent of becoming members of the Navajo Nation, and there was no indication from the method of producing the roll that all those listed were Navajo, the BIA concluded there was no evidence of the bilateral political relationship necessary to determine membership in an Indian tribe.

The Navajo Nation brought this action (CIV 90–666) challenging the decision to grant tribal status to the San Juan Southern Paiute Indians. That action was consolidated with CIV 74–842, an action commenced by the Hopi Tribal Chairman pursuant to 25 U.S.C. § 640d–7 to determine the rights and interest in that area of the Navajo Reservation described in the Act of June 14, 1934, 48 Stat. 960. The Act establishing the 1934 boundaries conveyed equitable title to the Navajo Tribe and "such other Indians as may already be located thereon." The Paiute Tribe intervened in CIV 74–842, claiming an interest in the 1934 Reservation area as a "tribe" within the meaning of § 640d–7.[5] If this Court upholds the BIA decision to recognize the Paiutes as a tribe, this Court may have jurisdiction under § 640d–7 to determine the Paiute Tribe's interest in the Reservation.

The Paiute Tribe has filed a motion to dismiss CIV 90–666, and the Paiute Tribe, the Navajo Nation, and the United States have filed motions for partial summary judgment in CIV 74–842 regarding this issue.

*The Paiute Tribe's Motion to Dismiss*

In support of its motion to dismiss, the Paiute Tribe argues that it is an indispensable party to CIV 90–666, and cannot be joined due to its sovereign immunity and because the Administrative Procedures Act

---

**5.** 25 U.S.C. § 640d–7(a) provides:

Either tribe, acting through the chairman of its tribal council for and on behalf of the tribe, is hereby authorized to commence or defend in the District Court an action against the other tribe and any other tribe of Indians claiming any interest in or to the area described in the Act of June 14, 1934, except the reservation established by the Executive Order of December 16, 1882, for the purpose of determining the rights and interest of the tribes in and to such land and quieting title thereto in the tribes.

("APA") does not provide a cause of action against non-federal defendants. The Paiute Tribe also argues that tribal recognition is a non-justiciable political question.

■ To determine whether a party is "indispensable" under Fed.R.Civ.P. 19,[6] a court must undertake a two-part analysis: it must first determine if an absent party is "necessary" to the suit. Second, if a party is "necessary" but cannot be joined, the court must determine whether the party is "indispensable" so that in "equity and good conscience" the suit should be dismissed. "The inquiry is a practical one and fact specific." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990), *citing, Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118–119, 88 S.Ct. 733, 742–43, 19 L.Ed.2d 936 (1968). To determine whether a party is necessary, a court first must decide whether complete relief is possible among those already parties to the suit. *Makah Indian Tribe*, 910 F.2d at 558, *citing, Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship & Training Comm.*, 662 F.2d 534, 537 (9th Cir.1981), *cert. denied*, 459 U.S. 917, 103 S.Ct. 231, 74 L.Ed.2d 183 (1982). Second, a court must determine whether the absent party has a legally protected interest in the subject of the action. *Makah Indian Tribe*, 910 F.2d at 558, *citing, Northern Alaska Envtl. Center v. Hodel*, 803 F.2d 466, 468 (9th Cir. 1986). If a legally protected interest exists, the court must further determine whether that interest will be impaired or impeded, or whether there is a risk of

inconsistent obligations to the persons already parties. *Makah Indian Tribe*, 910 F.2d at 558.

■ The Paiute Tribe is clearly a necessary party. First, The Paiute Tribe has an interest in maintaining the substantial monies and services attendant to formal government recognition, which will be impaired if this Court refuses to uphold the recognition. Further, the United States may be subject to conflicting liabilities if the Paiute Tribe is not joined, as the Paiute Tribe would not be subject to any decision regarding recognition in its absence.

The Court must next examine whether the Paiute Tribe can be joined as a party to CIV 90–666. The Paiute Tribe claims that two factors prevent its joinder: it is immune from suit due to sovereign immunity and the APA does not provide a cause of action against non-federal defendants.

■ It is clear that federally recognized Indian tribes are entitled to sovereign immunity absent Congressional waiver or tribal consent to suit. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *Pan American v. Sycuan Bank of Mission Indians*, 884 F.2d 416, 418 (9th Cir.1989). This Court must decide whether the Paiute Tribe can claim immunity when it is disputed whether the San Juan Southern Paiutes should have been granted tribal status.

The Paiute Tribe argues that sovereign immunity is available even to an unrecog-

---

**6.** Rule 19(a) states in relevant part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
Rule 19(b) states in relevant part:

If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

nized tribe, citing *Bottomly v. Passama-quoddy Tribe,* 599 F.2d 1061 (1st Cir.1979). In *Bottomly,* the First Circuit upheld a dismissal based on sovereign immunity even though the Passamaquoddy Indians were not a federally recognized tribe. The Court held:

> [O]ur research has uncovered, no case which *conditions* the invocation of sovereign immunity on the factors emphasized by the state or appellant: formal federal recognition of the particular tribe by treaty or statute, a prolonged course of dealing between the tribe and the federal government, geographic location, the tribe's warlike nature, the absence of state protection of a tribe or the continued full exercise of a tribe's sovereign powers.
>
> The absence of authority is not surprising, for the analysis urged by appellant and the state seems to us to fundamentally misconceive basic principles of federal Indian law. In effect, their approach would condition the exercise of an aspect of sovereignty on a showing that it had been granted to the tribe by the federal government, either by explicit recognition or implicitly through a course of dealing. As the Supreme Court recently explained, however, the proper analysis is just the reverse: "The powers of Indian tribes are, in general, *'inherent powers of a limited sovereignty which has never extinguished'.* [Quotation from *United States v. Wheeler,* 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (emphasis in original) ].

*Bottomly,* 599 F.2d at 1065–1066.

■■■ The Ninth Circuit also does not require official federal recognition in order that an Indian tribe can assert sovereign immunity. It does, however, require "tribal status". In *State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1387 (9th Cir.1988), the Court stated:

> [T]ribal status [is] arguable in the event of IRA [Indian Reorganization Act] organization.
>
> \* \* \* \* \* \*

If the IRA does not settle the matter, the inquiry would shift to whether [the Indian group] has been otherwise recognized as a tribe by the federal government. *See, e.g., Price [v. State of Hawaii* ], 764 F.2d at [623] 626–628 [9th Cir.1985]. Failing there, tribal status may still be based on conclusions drawn from careful scrutiny of various historical factors. *See, e.g., Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 582–88 (1st. Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

*State of Alaska,* 856 F.2d at 1387.[7] In fact, sovereign immunity continues "even after dissolution of the tribal government." *Bottomly,* 599 F.2d at 1066, *citing, United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940).

In order to determine whether the Paiute Tribe has "tribal status" conferring sovereign immunity on the tribe, this Court must either examine whether the federal recognition should be upheld, or undertake a "careful scrutiny of various historical factors." Whether the federal recognition will be upheld involves two issues: whether federal recognition is a non-justiciable political question, and if not, what amount of deference this Court must give to the administrative determination.

Early authority indicates that federal determination of tribal status is a political question inappropriate for judicial decision. In *United States v. Holliday,* 70 U.S. (3 Wall.) 407, 18 L.Ed. 182 (1866), the Supreme Court held that the issue of whether a tribal entity existed was the duty of the "executive and other political departments of the government." The Court said, "If by them those Indians are recognized as a tribe, this court must do the same." The Supreme Court in *Baker v. Carr,* 369 U.S. 186, 215–217, 82 S.Ct. 691, 709–710, 7 L.Ed.2d 663 (1962), also discussed tribal status as an example of a political question. *Baker* also articulated an exception to this rule: "the courts will strike down any

---

**7.** As the Court was considering an interlocutory appeal from a preliminary injunction, it did not reach the issue of whether the Village of Venetie could demonstrate tribal status.

heedless extension of that label. They will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power," citing *United States v. Sandoval*, 231 U.S. 28, 45–46, 34 S.Ct. 1, 5, 58 L.Ed. 107 (1913).. The Paiute Tribe contends that the "heedless extension" exception does not apply in this case since "Indianness" is not an issue, but rather whether the Paiute Indians are a tribe.

The Ninth Circuit has not directly addressed whether tribal status is still viewed as a political question. It is clear, however, that the Ninth Circuit gives great deference to the prerogative of the other branches of government to recognize the existence of an Indian Tribe. In *Price v. State of Hawaii*, 764 F.2d 623 (9th Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771, *reh. denied*, 475 U.S. 1091, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986), the Hou Indians brought suit to force the State of Hawaii to disburse funds to them as part of a federal land trust. The case had been dismissed by the district court for lack of jurisdiction under 28 U.S.C. § 1362 [8] as the Hou Indians had not been recognized by the Secretary of the Interior. Since the relevant statute and regulations addressing recognition did not include the Hawaiian people, the Ninth Circuit looked at those factors employed by the Department of Interior to determine tribal status. The Ninth Circuit found that the Hou did not establish eligibility for recognition applying these standards, and stated, "In the absence of explicit governing statutes or regulations, we will not intrude on the traditionally executive or legislative prerogative of recognizing a tribe's existence", *Price*, 764 F.2d at 628, *citing Sandoval*, 231 U.S. 28, 34 S.Ct. 1, and *Holliday*, 70 U.S. (3 Wall.) 407.

Although *Price* does not directly address the standard of review of executive recognition of Indian tribes, the Court in *Price* cites Felix Cohen's *Handbook of Federal Indian Law* 3–5 (1982). Cohen states:

When Congress or the Executive has found that a tribe exists, courts will not normally disturb such a determination. Some older cases have characterized such determinations as political questions, outside the scope of judicial review [citing *Holliday* and *Baker v. Carr*, among other cases]. * * * For most current purposes, judicial deference to findings of tribal existence is still mandated by the extensive nature of congressional power in the field. * * * No congressional or executive determination of tribal status has been overturned by the courts, but a limit on Congress' power to define tribal status was suggested in *United States v. Sandoval:*

> Of course, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts.

*Sandoval, supra* [231 U.S.] at 46 [34 S.Ct. at 6]. The Supreme Court has never refined the "arbitrariness" standard referred to in *Sandoval*. In light of the deference given to congressional and executive determinations in this area, however, it would appear that the only practical limitations upon congressional and executive decisions as to tribal existence are the broad requirements that (a) the group have some ancestors who lived in what is now the United States before discovery by Europeans, and (b) the group be a "people distinct from others," [citing *The Kansas Indians*, 72 U.S. (5 Wall.) 737, 755, 18 L.Ed. 667 (1867)].

Most courts have consistently refused to overturn executive determination of tribal status. In *James v. Dep't of Health & Hum. Servs.*, 824 F.2d 1132 (D.C.Cir.1987),

---

**8.** 28 U.S.C. § 1362 provides:

The district courts shall have original jurisdiction of all civil actions brought by any Indian tribe or band with a governing body duly recog-

nized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

the Gay Head Indians brought suit against the Department of Interior for placement on a list of federally recognized tribes, pending the Department of Interior final determination. The suit was dismissed for failure to exhaust administrative remedies. The Court stated, "[I]f the Executive branch determines that a tribe of Indians is recognized, that decision must be respected by the Judicial Branch." *James* at 1137. The *James* Court also rejected the reasoning of *Mashpee v. New Seabury Corp.*, 592 F.2d 575 (1st Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979), which held that the question of tribal status did not require deference.

▮▮▮ Therefore, even though modern law may not treat tribal existence as a political question, as such, it is clear that most courts give great deference to congressional and executive determinations of tribal status. Only if the determination was a "heedless extension" and "a manifestly unauthorized exercise of power" can federal recognition by set aside by a court. *Sandoval*, 231 U.S. 28, 34 S.Ct. 1. Although the Navajo Nation argues that the BIA's decision was arbitrary and capricious under the APA, it does not, and cannot, argue that the recognition of the Paiute Indians is a "heedless extension" of the Indian "label". The federal recognition will therefore be upheld, and the Paiute Tribe is entitled to assert sovereign immunity as a defense to being joined in this action.

However, the Paiute Tribe can be joined if its sovereign immunity has been waived. "The sovereign immunity that naturally flows from tribal sovereignty will not be effective if it has been divested by Congress or otherwise lost by implication." *State of Alaska*, 856 F.2d at 1387. "Waiver may not be implied, but must be expressed unequivocally." *McClendon v.*

*U.S.A.*, 885 F.2d 627 (9th Cir.1989), *citing, Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. at 1677. The Navajo Nation does not claim that Congress has waived the tribe's immunity. However, the Paiute Tribe may have waived sovereign immunity through its intervention in CIV 74–842.

The *McClendon* case discusses in some detail when involvement in a previous action will be deemed a waiver of sovereign immunity. In that case, the Colorado River Indian Tribe had previously brought an ejectment suit against plaintiffs' predecessors in interest; the settlement in that case provided for a long-term lease to plaintiffs. When the plaintiffs brought the immediate action regarding a breach of that lease, the Court held that the tribe's sovereign immunity was not waived by its participation in the initial lawsuit and dismissed the case. The Court said, "a tribe's waiver of sovereign immunity may be limited to the issues necessary to decide the action brought by tribe; the waiver is not necessarily broad enough to encompass related matters, even if those matters arise from the same set of underlying facts." *McClendon*, 885 F.2d at 630.

▮▮▮ In order that the Paiute Tribe be entitled to assert an interest in the 1934 Reservation under 25 U.S.C. § 640d–7, the Paiutes must be a "tribe".[9] Thus, federal recognition is relevant to the outcome in CIV 74–842, in which the Paiute Tribe intervened. However, whether the Paiutes are an Indian tribe is not an issue being litigated in CIV 74–842. Since tribal status will not be decided in CIV 74–842, the Paiute tribe did not waive its sovereign immunity for CIV 90–666 by its intervention in CIV 74–842.

▮▮▮ The Paiute Tribe may not be joined,[10] and this Court must decide wheth-

---

**9.** This Court is not expressing an opinion here whether § 640d–7 gives this Court authority to adjudicate the interests of the Paiute Tribe in the 1934 Reservation. The Court will decide in another order whether the Paiute Tribe may assert its interests under § 640d–7 or whether the Paiutes are limited to grants of allotments under § 640d–8.

**10.** The Paiute Tribe also contends that it cannot be joined as a defendant because the APA does not provide a cause of action against non-federal defendants, citing *Vieux Carre Property Owners v. Brown*, 875 F.2d 453 (5th Cir.1989), *cert. denied*, 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 739 (1990). This Court need not decide this issue, however, given its decision that the Paiute

er "in equity and good conscience the action should proceed among the parties before it, or should be dismissed." Fed. R.Civ.P., Rule 19(b). To make this determination, this Court must look at four factors: (1) the prejudice to that party or those already parties, (2) the extent to which the prejudice can be lessened by protective provisions in the judgment, (3) whether the judgment will be adequate, and (4) whether the plaintiff will have adequate remedy if the action is dismissed. *Confederated Tribes v. Lujan,* 928 F.2d 1496, 1499 (9th Cir.1991).[11]

In *Kickapoo Tribe of Oklahoma v. Lujan,* 728 F.Supp. 791 (D.D.C.1990), the Oklahoma Kickapoo Tribe brought suit against the government to prevent the recognition of the Texas Kickapoo Tribe. The district court found that the Texas tribe was an indispensable party which could not be joined due to sovereign immunity, and dismissed the case. That court said:

> There is no doubt that the Texas Band will be prejudiced by a decision rendered in its absence. * * * To allow this litigation to proceed in the Band's absence would promote the worst kind of paternalism and seriously undermine the Band's interest in its own survival. After all, the Band really is the subject at the center of this litigation. * * * [T]he Court does not believe that the government will adequately represent the interests of the Band.
>
> \* \* \* \* \* \*

Plaintiffs argue that if they are precluded from bringing an action in the absence of the Band, they will be without a forum in which to assert their claims, noting that the Texas Band does not have a tribal court system. However, our Court of Appeals in *Wichita* [*Wichita and Af-*

*filiated Tribes of Oklahoma v. Hodel,* 788 F.2d 765 (D.C.Cir 1986) ], while recognizing that a court should be "extra cautious in dismissing a case for nonjoinder" where the plaintiff otherwise may be without an adequate remedy, went on to conclude that where the dismissal of a suit was mandated by tribal immunity, the result was "less troublesome." *Id.* at 777. * * * [T]hat policy was strong enough to outweigh plaintiff's interest in having an available forum. *Id. Kickapoo Tribe,* 728 F.Supp. at 797.

Further, in *McClendon,* the Ninth Circuit held that the Colorado River Indian Tribe was an indispensable party, stating, "Any judgment in favor of McClendon will adversely affect the Tribe's interests, and because the relief sought by McClendon relates to the activities of the Tribe, any relief obtained in the Tribe's absence would be inadequate." *McClendon,* 885 F.2d at 633.

Certainly, a judgment in favor of the Navajo Nation in this case will drastically affect the interests of the Paiute Tribe in receiving federal services and funding.[12] Further, the reasoning of the district court in *Kickapoo Tribe* is forceful; indeed, allowing this litigation "to proceed in the [Paiutes'] absence would promote the worst kind of paternalism and seriously undermine the [Paiute Tribe's] interest in its own survival." *Kickapoo Tribe,* 728 F.Supp. at 797. CIV 90–666 will thus be dismissed.

*Cross-motions for Summary Judgment*

All parties have moved for summary judgment on the issue of whether the federal recognition of the Paiutes as an Indian tribe should be upheld. Although this Court will dismiss CIV 90–666, this Court will also address the cross-motions for sum-

---

Tribe may not be joined due to its assertion of sovereign immunity.

**11.** The Ninth Circuit has recognized that some courts have held "that when the necessary party is immune from suit, there is very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." *Confederated Tribes,* 928 F.2d at 1499, *citing, Enterprise Mgt. Consultants v. United States,* 883 F.2d 890, 894 (10th Cir.1989). The Ninth Circuit

continues to apply the Rule 19(b) factors. *See Confederated Tribes,* 928 F.2d at 1499; *Makah Indian Tribe,* 910 F.2d at 560; *Lomayaktewa v. Hathaway,* 520 F.2d 1324, 1326 (9th Cir.1975), *cert. denied,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976).

**12.** The prejudice under Rule 19(b) stems from the same legal interests that make a party "necessary" under Rule 19(a). *Confederated Tribes,* 928 F.2d at 1499 [citations omitted].

mary judgment in order to complete the record.

As discussed previously, the recognition of the Paiute Tribe was based on the finding by the BIA that the Paiutes listed on the Navajo census were not members of the Navajo Nation because there was "little evidence to show that the [Navajo census] is a tribal roll in the sense that it is exclusively a list of Navajo tribal members." The decision turned on an administrative determination that the term "tribal roll" required evidence of a bilateral political relationship.

An agency's interpretation of its regulations is given great weight unless the interpretation is "plainly erroneous or inconsistent with the regulation." *State of Cal. Dep't of Educ. v. Bennett*, 833 F.2d 827 (9th Cir.1987), *citing Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, *reh. denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965).[13]

The Navajo Nation argues that the BIA's decision regarding the meaning of a "tribal roll" is contrary to the plain meaning of the regulations and renders two of the regulation provisions superfluous.[14] First, the Navajo Nation contends that the requirement that the Navajo have a membership list which includes only Navajos renders the requirement that the individual meet tribal membership requirements (part [1a])

meaningless. The Navajo Nation also argues that Interior's interpretation renders the "listed on a tribal roll" requirement of part [2b] superfluous, as it requires the tribal roll to be a list of those maintaining tribal relations, which is already expressed in part [2a].

Both the government and the Paiute Tribe argue that the last two phrases, "maintained continuous tribal relations" and "listed on a tribal roll" *do* mean the same thing in order to effectuate the philosophy that tribal membership is a bilateral political relationship. They argue that if a membership list or roll is maintained in a way that indicates that it includes only those who have maintained relations with the tribe, demonstrating the existence of that "tribal roll" is simply a short-hand way of demonstrating the maintenance of relations.

Further, the government argues that the Navajo Tribal Code provides for enrollment procedures which reflect this bilateral political relationship, requiring individual members to apply for membership and a screening committee to consider the applications. However, the roll has not been produced in accordance with the Tribal Code, and the Navajo continue to use a census list which does not require individuals to affirmatively join the Navajo Nation.

---

**13.** The Navajo Tribe contends that the Court owes no deference to the BIA's legal interpretation of "tribal roll", citing Professor Davis' treatise on administrative law that a court is free to substitute its judgment for an agency's interpretation of law. However, this applies to an agency's interpretation of *statutes* and not *regulations*, and case law has consistently held that a court cannot reject the agency interpretation of a legislative regulation unless the agency's interpretation is unreasonable. Moreover, the law regarding the deference to agency interpretation of law has been changing. In his most recent supplement to his treatise, Professor Davis explains that the Supreme Court in *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh. denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984), stated in dictum that the court could not substitute its judgment of the meaning of a statute if the agency's interpretation was based on a permissible construction. 1989 Supplement, K.C. Davis, *Administrative Law Treatise* § 29.16–1 at 508 (2nd Ed.1984).

Further, the Navajo Tribe argues that the BIA's interpretation of "tribal roll" has been inconsistent and the court therefore owes its present interpretation no deference. However, the Supreme Court has held that "deference may be given to interpretations that are not consistent." 5 K.C. Davis, *Administrative Law Treatise* § 29.16 at 400 (2nd Ed.1984), *citing Morrison–Knudsen Construction Co. v. Director*, 461 U.S. 624, 103 S.Ct. 2045, 2056, 76 L.Ed.2d 194 (1983).

**14.** § 83.1(k) defines tribal membership as:

[1][a] "Meets the membership requirements of the tribe as set forth in its governing document" or

[b] "is recognized collectively by those persons comprising the tribal governing body," and

[2][a] "has continuously maintained tribal relations with the tribe" or

[b] "is listed on the tribal rolls of the tribe as a member, if such rolls are kept."

The Navajo Nation responds that the BIA's construction of the term "tribal roll" is strained and "ignores the practical realities of tribal administration." Navajo details its use of the census list, indicating its extensive use in the administration of the Tribe. It contests the necessity for it to follow an expensive procedure set out in the Tribal Code, if it already has a list on which it relies to determine membership.

The BIA based its decision on a reasonable interpretation of its regulation. The concept of a bilateral political relationship is a strong one throughout Indian law. F. Cohen, *Handbook of Federal Indian Law* (1982). The Navajo Nation attempts to unilaterally include the Paiutes as part of the Navajo Tribe simply by the fact that Paiutes were listed on a census list which was initially created without regard to tribal affiliation. Further, there is substantial evidence cited that the Paiutes have not maintained tribal relations with the Navajo and that the Navajo did not view the Paiutes as a part of the Navajo Nation. Thus, the BIA's interpretation that the tribal roll must demonstrate a bilateral political relationship is not clearly erroneous and will be upheld.

 The Navajo Nation also argues that the BIA's decision violates its right to determine questions regarding its own membership. The right to define membership is a right central to the existence of an Indian tribe. *Santa Clara Pueblo*, 436 U.S. 49, 98 S.Ct. 1670. However, in *Martinez v. Southern Ute Tribe of the Southern Ute Reservation*, 249 F.2d 915 (10th Cir.1957), *cert. denied*, 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067, *reh. denied*, 357 U.S. 924, 78 S.Ct. 1374, 2 L.Ed.2d 1376 (1958), the Tenth Circuit held, "for purposes of which the tribe has complete control, the tribe conclusively determines membership; but where departmental action is authorized, the department may approve or disapprove the membership rolls of the tribe." In this case, the department is authorized to determine the existence of Indian tribes; if this analysis were foreclosed by the Navajo Tribe's assertion of unilateral control over membership, it would defeat the entire purpose of the regulations.

Finally, the Navajo Nation argues that the Department of Interior is departing from a long-held position that the Navajo census is a membership roll for federal purposes, citing various internal memorandum which state that the BIA would accept the census list as a "base roll." These memoranda involved a dispute between the Navajo Nation and the Department of Interior regarding costs for the maintenance of the census list after the Navajo Nation contracted with the government to take over the responsibility of updating the list. The Navajo Nation was concerned that the government would shift the obligation to pay for the maintenance of the census to the Tribe, and then argue that there was no "final roll" from which to determine eligibility for services or benefits.

Throughout these memoranda, the government stated that it was not necessary for the Tribe to create a "final or base roll", which was generally only used for the distribution of tribal assets, since the Navajo Nation had always used the census roll as a "base roll." On the other hand, the Navajo's position in that dispute was also inconsistent with the one now taken. The Navajo Nation had then argued that the census list was not a "base roll ... from which Tribal enrollment" could be compiled.

Despite both parties' inconsistencies regarding whether there was a "base roll" which established Navajo membership, the previous dispute involved a different statute, for which a different interpretation of "base roll".

Given that the BIA's interpretation that the tribal roll must demonstrate a bilateral political relationship is not clearly erroneous, the federal recognition of the San Juan Southern Paiute Indians as an Indian tribe will be upheld.

Accordingly,

IT IS ORDERED that the San Juan Southern Paiute Tribe's Motion to Dismiss CIV 90–666 is granted. (Document # 780).

IT IS FURTHER ORDERED that the San Juan Southern Paiute Tribe's Motion for Partial Summary Judgment is granted. (Document # 778).

IT IS FURTHER ORDERED that the United States' Motion for Partial Summary Judgment is granted. (Document # 798).

IT IS FURTHER ORDERED that the Navajo Nation's Motion for Partial Summary Judgment is denied. (Document # 770).