**MIAMI NATION OF INDIANS OF INDIANA, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**No. 3:92–CV–0586RM.**

United States District Court,
N.D. Indiana,
South Bend Division.

July 26, 2000.

Arlinda F. Locklear, Jefferson, MD, Lorna K Babby, Native American Rights Fund, Washington, DC, David L Kiley, Sr., Albert C. Harker, Keith M. Harper, Kiley Kiley Harker Rogers, Michael and Certain, Marion, for Miami Nation of Indians of Indiana Inc. aka Miami Nation of Indiana and the Miami Indians of Indiana, Frances Dunnagan, Chairman of the Miami Nation of Indians of Indiana, Inc., plaintiffs.

## MEMORANDUM AND ORDER

MILLER, District Judge.

Today concludes a series of motions and rulings relating to the challenge by the plaintiffs—Miami Nation of Indians of Indiana, Inc., and its chairman, to which the court refers simply as "the Miamis" in this opinion—to the Department of the Interior's decision not to recognize the plaintiffs as an Indian tribe. The parties agreed at the case's outset to divide the case into distinct phases, with opportunities for appropriately limited discovery to be afforded in each phase. The plaintiffs seek recognition as the Miami Nation of Indians, and they sue the Department of the Interior, the United States of America, and the Secretary of the Interior; this opinion refers to the defendants (and to the decision-makers in the Department of the Interior) collectively as "the Department." Review is under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A).

In earlier rulings in this case, the court held that the statute of limitations barred the Miamis' challenge to an Interior Department action based on Attorney General Van Devanter's 1897 decision that the Miamis were no longer tribal Indians subject to the United States' trust responsibilities, and so granted the Department judgment on Count 1 of the Miami complaint. *Miami Nation of Indians of Indiana, Inc. v. Lujan,* 832 F.Supp. 253 (N.D.Ind.1993).

The court next granted the Department judgment on Counts 2 and 3 of the complaint, holding that the regulations under which the Department decided the Miamis' acknowledgment petition were valid. *Miami Nation of Indians of Indiana, Inc. v. Babbitt,* 887 F.Supp. 1158 (N.D.Ind. 1995). Since then, the parties have moved toward resolution of the challenge to the Department's acknowledgment decision, obtaining along the way rulings on the scope of the record on which the court is to decide that challenge. *Miami Nation of Indians of Indiana v. Babbitt,* 979 F.Supp. 771 (N.D.Ind.1996); *Miami Nation of Indians of Indiana, Inc. v. Babbitt,* 55 F.Supp.2d 921 (N.D.Ind.1999).

Counts 4 through 6 of the Miamis' amended complaint remain for resolution today. In Count 4, the Miamis contend that the Department refusal to acknowledge them under the 1978 regulations, 25 C.F.R. Part 83 (1982), was arbitrary and capricious. In Count 5, they argue that the Department unlawfully refused to reconsider their petition under the 1994 revisions to the acknowledgment regulations, 25 C.F.R. Part 83 (1994). In Count 6, the Miamis contend that the 1897 decision to treat the recognized Miami Indians differently from other recognized Indian tribes is unlawful under the 1994 amendment to the Indian Reorganization Act, 25 U.S.C. § 476(g). The parties filed extensive and thorough briefs, making unnecessary the oral argument the Miamis request. For the reasons that follow, the court grants the Department's summary judgment motion and denies the Miamis' summary judgment motion. The court finds that the 1994 amendment to the Indian Reorganization Act did not affect the Miamis' rights or status, that the 1994 regulations don't apply to the Miami petition, and that the Department acted within its authority when it decided the Miamis' petition for acknowledgment—one of the hard decisions Congress assigned to the Department.

## I.

### A.

The 1978 acknowledgment regulations require a group seeking recognition as a tribe to satisfy seven criteria. 25 C.F.R pt. 83.7(a)-(g) (1982). The Department found that the Miamis fell short on criteria (b) and (c), which required that a "substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area" and "tribal political influence or other authority over its members as an autonomous entity throughout history until the present". The Department found that the Miami met those criteria years ago, but that the Miamis had changed since 1940 or so. The Department concluded that the Miamis didn't show that they had existed continuously as a community exercising political authority, and so hadn't shown by a reasonable likelihood that they continued to exist as a tribe throughout history.

The Miamis, disagreeing with that conclusion, met with Department personnel with an eye toward further research. The Department declined the Miamis' offer to do a network analysis to establish existence of contemporary Miami community. The Department didn't suggest, and the Miamis didn't propose, a systematic ethnography. The Miamis submitted additional research, and Department personnel made a site visit.

On February 28, 1992, Bureau of Indian Affairs experts in the Branch of Acknowledgment and Research drafted a request to the Assistant Secretary for Indian Affairs for "policy direction as to whether the level of social relationships and tribal political authority the Miami have maintained are consistent with the intent of the regulations...." The Branch of Acknowledgment and Research people viewed the material on criteria (b) and (c) as falling "between previous positive and negative cases." It is unclear from the record whether the Assistant Secretary received or responded to such a request. An April 3, 1992 briefing paper for the Assistant Secretary says, "The BAR has received direction indicating that while there is some minimal degree of social contact among a limited number of the Miami membership, and while there is an organization that claims to represent the group's interests, these do not reach the level envisioned for tribal status by the Acknowledgment regulations." On June 9, 1992, the Department announced a final determination against acknowledgment of the Miamis.

The Miamis contend that the 1992 final determination was arbitrary and capricious because (1) its geographic distribution analysis resulted from erroneous interpretation of the regulations, didn't take important data into account, and contravened the Department's analysis in other cases; (2) the Department declined the chance to obtain, through an ethnographic study, data it said was needed to prove community and ignored key evidence of community, such as kinship patterns and cultural differences; (3) in analyzing the political authority criterion, the Department required a showing of bilateral political relations, which isn't found in the regulations, and also made factual errors; and (4) the Department's decision-making process was seriously flawed.

### B.

 Federal acknowledgment establishes an intergovernmental relationship between the United States and the acknowledged tribe. An acknowledged tribe becomes a domestic dependent nation with inherent sovereign authority independent of the United States and independent of the state in which it is located. *Cherokee Nation v. Georgia*, 30 U.S. 1, 17, 5 Pet. 1, 8 L.Ed. 25 (1831). An acknowledged tribe may exercise jurisdiction over its territory and establish tribal courts than can assert

criminal misdemeanor jurisdiction over non-Indians, and gains considerable other discretionary authority under federal law. *See, e.g.,* 25 U.S.C. § 450–450n (Indian Self–Determination and Education Assistance Act of 1975); 25 U.S.C. §§ 2701–2721 (Indian Gaming Regulatory Act); 25 U.S.C. § 177 (Trade and Non–Intercourse Act).

■ For purposes of acknowledgment and dealings with the federal government, a tribe is a political institution, *Morton v. Mancari,* 417 U.S. 535, 553, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), so racial or ancestral commonality isn't enough, without a continuously existing political entity, to constitute a tribe for these purposes, 25 C.F.R. § 83.3(a), (c), *accord, United Houma Nation v. Babbitt,* Civ. No. 96–2095(JHG), 1997 WL 403425, at *7 (D.D.C. July 8, 1997). With these concerns in mind, the 1978 regulations set forth seven criteria that a petitioning tribe had to meet (and had the burden of showing) for acknowledgment as a tribe:

83.7(a): that the petitioner has been identified from historical times until the present on a substantially continuous basis, as 'American Indian,' or 'aboriginal';

83.7(b): that a substantial portion of the petitioning group inhabits a specific area or lives in community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area; and,

83.7(c): that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present.

83.7 (d): the group's present governing document;

83.7(e): a list of all known current members of the group consisting of individuals who descend from a tribe which existed historically or from historical tribes which combined and functioned as a single autonomous entity;

83.7(f): that the membership of the petitioning group is composed principally of persons who are not members of any other North American Indian tribe; and

83.7(g): that the petitioner is not the subject of congressional legislation which has expressly terminated or forbidden the Federal relationship.

25 C.F.R. § 83.7. A petitioner has the burden of proof to present sufficient evidence to meet the criteria. The Department and the Bureau of Indian Affairs researchers aren't responsible for a petitioning tribe's research. 25 C.F.R. § 83.6(d).

On July 12, 1990, the Assistant Secretary of the Interior issued a preliminary decision tentatively concluding that the Miamis hadn't met the regulatory criteria. A summary, accompanied and based upon some 240 pages of technical reports, set forth the Assistant Secretary's evaluation of the facts and evidence in the context of the regulatory criteria. The reports included genealogical and anthropology work produced by outside researchers (anthropologist Dr. Susan Greenbaum and genealogist Alycon Pierce) with whom the Department had contracted. The preliminary decision tentatively found that the Miamis satisfied five of the seven regulatory criteria, but there wasn't enough evidence that they were continuously a community or that they exercised political authority throughout history over their members.

During the comment period, the Department provided technical assistance to the Miamis and thrice extended the deadline for their comments and supplemental evidence. BIA researchers conducted an onsite field visit. Although developments in comment periods have led the Assistant Secretary to a different finding in other cases, that didn't happen this time: the BIA found what it considered too little detail and supporting data in the Miamis'

additional evidence and comments, and invited supporting materials.

On June 9, 1992, the Assistant Secretary issued final determination addressing information collected by the researchers and the Miamis' comments on the proposed finding. Notice was published in the *Federal Register*. The final determination included a 95–page technical report and a 29–page summary (the final decision-making document) analyzing, discussing and weighing the evidence. The Assistant Secretary again concluded that the Miamis didn't present sufficient evidence under the regulatory criteria. The only comments that had been received related to the proposed finding's conclusions on continuous existence as a community (criterion (b)) and political authority (criterion (c)); the Assistant Secretary found the evidence insufficient to satisfy those criteria for the period from the 1940s to 1992. The Assistant Secretary found that the evidence showed that the Miami was not a community, and did not exercise political authority, at the time of the final determination.

1.

*Community Criterion.* Under the 1978 regulations, a "community" requires more than geographic proximity. The Department asks whether enough of the petitioning tribe live close enough to each other to facilitate actual meeting, association, and regular conduct of tribal business. A petitioner can make such a showing indirectly, by pointing to social and religious activities and meetings of organizations attended entirely or predominantly by tribal members. The community's members must be descendants of an Indian tribe, and should be such that the community (and others) see it as American Indian and distinct from others in the area. The Department reads the regulation as requiring that the petitioning tribe's members meet and interact, that the petitioning tribe's members be distinct and seen as American Indian, and that the petitioning tribe be a dynamic group rather than simply many people with common Indian ancestors.

In finding that the Miamis didn't satisfy this criterion, the Department's final determination concluded that:

[s]ome degree of social contact among the membership has been maintained throughout Miami history, but the remaining extent of social interaction and social ties among members has become reduced to a low level.... We find that social contact within the present-day Miami membership is extremely limited in degree and extent, and there is virtually no social distinction between Miami members and the non-Miamis with whom they interact. The Miami do not meet the intent of the regulations and the precedents underlying the regulations that to be acknowledged as a tribe a group must constitute a community which is distinct and whose members have significant social ties with each other. We conclude, therefore, that the Miami do not meet the requirements of criterion b.

The Department thought the Miamis were indistinct from the non-Indian population and not viewed by others as American Indian. The Department thought that since the early 1940s (the era as to which proof would be most easily accessible), Miami members didn't associate regularly or interact enough to have maintained tribal relations, and didn't know other tribe members. Interaction and community existed in, but only in, earlier generations. The Assistant Secretary noted evidence of occasional activity, biannual meetings (after 1980), and an annual tribal reunion, but thought the activity too limited in scope and time, and the participation too narrow, to produce the community contemplated by the regulations:

In order to meet the requirements of [§ 83.7(b) of] the regulations, the petitioner must be more than a group of descendants with common tribal ancestry who have little or no social connection with each other. Sustained interac-

tion and significant social relationships must exist among the members of the group. Interaction must be shown to have been occurring on a regular basis, over a long period of time. Interaction should be broadly distributed among the membership. Thus a petitioner should show that there is significant interaction and/or social relationships not just within immediate families or among close kinsmen, but across kin group lines and other social subdivisions. Close social ties within narrow social groups, such as small kin groups, do not demonstrate that the members of the group as a whole are significantly connected with each other.

The Department thought there was too little evidence of regular tribe-wide interaction and social cohesion among the 4,200 or so Miami tribe members. The Department believed that evidence of marriage among members, of use of native language, and of shared and distinct cultural practices disclosed only a community that existed early in the twentieth century, and that had ceased to exist by 1940.

The Department considered the applicability of presumptions that can favor a petitioner for acknowledgment. One of those presumptions relates to intermarriage: because of the impact of close kinship relationships on interaction in future generations and social cohesion, the Interior Department presumes a community's existence when at least half the petitioning tribe marries other members of the group. The Miami record, as the Department saw it, showed considerable intermarriage between 1846 and 1864, then a rapid decline to virtually none after the 1930s.

Another such presumption relates to native language or religious beliefs or practices: community is presumed upon a showing that half the membership use the native language or share religious beliefs or practices. The Miami didn't make such a showing, and didn't show post–1940 attendance at predominantly Indian churches, schools or other social institu-tions, or of post–1940 shared, distinct, institutions. The Department, noting the absence of predominantly Miami clubs or churches, concluded that Miamis and non-Miamis in the geographical area don't make significant distinctions in their interactions. Institutionalized social discrimination against the Miamis had disappeared around the middle of the twentieth century, and interactions among the Miamis were primarily within families. The tribe once was divided into five-subgroups, but the Department saw those subgroups as being of limited importance to the modern-day Miamis. The Miamis were not, in other words, a community within the Department's understanding of what the regulations require.

The Department presumes community from the existence of a geographic settlement if half the petitioning tribe's members reside in an area almost exclusively occupied by members of the group, with which the rest of the tribe maintains contact. About a third of the Miamis live in a five-county, 2,200–square mile area of Indiana, forming about 0.285% of the five-county population. The Department didn't consider that area a village-like setting that triggered a presumption of intra-tribal interaction, and hence community.

Finding that none of the presumptions of interaction applied, the Department looked for actual social interaction, and found only insubstantial social ties or interaction between Miamis who were not closely related as family members.

Within the five-county area, the Department found that the networks of contact were limited primarily to an annual reunion and business meetings—too limited, in the Department's view, to prove community. The people only lived close enough to each for interaction to be possible; persons identified as tribe members didn't interact with others outside their immediate families. Most tribe members outside the five-county area had no true contact with those within it, and had lived outside the area for generations.

The Miamis hold a yearly half-day reunion that includes about 3.5% of the membership, but the Department didn't consider that event to be the equivalent of the regular informal social relationships that connote the community contemplated by the regulations. The Department tried to weigh the reunion in combination with other indicia of community—funerals, weddings, godparenting, churches, cemeteries, language, and intermarriage—but decided there simply were too few other indicia of that sort. Indeed, as the Department looked deeper for other indicia, it became convinced not simply that other interaction was unproven, but further, that it simply didn't happen any more. A study of attendance at the annual reunion led the Department to conclude that the reunion wasn't representative of the membership and that no tribal social core existed within the five-county area.

The Department decided that the Miami met the community criterion until 1940, though social interaction began to wane in the 1880s. Members lost their land base, intermarriage fell off dramatically, tribal schools and churches disappeared, racial discrimination against the Miamis faded, and the native language was not passed on from one generation to the next. The elders remained active, but few others did so. The Department found that the "community" lasted until 1940, then members left the area, meetings were poorly attended, social interaction (apart from close family) was sporadic. By 1979, the group had withered away.

After the proposed findings were issued, the Miamis met with Branch of Acknowledgment and Research staff to discuss what the Miamis might do to change the Assistant Secretary's finding. The Miamis later proposed a plan to research such things as discrimination, unique cultural traits, interaction within families, contact across family lines, and relations between Miamis within and without the five-county area. The Department thought what the Miamis actually submitted—analyses of geography and reunion attendance, and arguments—was too limited to establish community within the regulations' meaning.

### 2.

*Political Authority Criterion.* The Department also concluded that the Miamis didn't satisfy the political authority criterion in § 83.7(e), which requires (consistent with the government-to-government relationship born of acknowledgment of a tribe, and the political authority that is granted, *United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977); *Morton v. Mancari,* 417 U.S. 535, 553, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *United States v. Washington,* 641 F.2d 1368, 1373 (9th Cir.1981), a showing "that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present."

"Autonomous," § 83.1(i) tells us, "means having a separate tribal council, internal process, or other organizational mechanism which the tribe has used as its own means of making tribal decisions independent of the control of any other Indian governing entity. Autonomous must be understood in the context of the Indian culture and social organization of that tribe." The 1978 regulations require a showing that the political authority has existed (formally or informally) throughout the tribe's history, and the guidelines that accompanied the 1978 regulations explained, "This can be demonstrated by showing the group has formal or informal leaders or councils and that they control the group or influence and guide it."

The Department found that contemporary Miami leadership had no demonstrable bilateral political relationship with most of the tribe's 4,200 members and didn't act on matters of consequence to the membership. Tribal leaders' influence began to decline at the end of the nineteenth century as the Miamis became assimilated into the surrounding populace. Leadership no longer affected the tribe members'

conduct, dealt with local authorities, or provided economic assistance. By the end of the 1940s, the Department concluded, political authority had ceased to exist.

The Miamis' submissions in response to the proposed findings persuaded the Department that it had misapprehended the tribal organization's activity. The Department still concluded, though, that the additional activities affected too small a slice of the tribal membership and too limited a range of issues to demonstrate the bilateral political relationship the regulations contemplate.

The Department didn't consider the activities of the three different Miami claims organizations (including the distribution of claims money) to be sufficient to show bilateral political relations between tribal leaders and members. The organizations' activity was almost exclusively handling a claims award from 1964 to 1973, after which most activity stopped. Only a handful of people did the organizations' work, and they made decisions without consulting, or being influenced by, the members. Even an organization such as that is evidence of a political process, so the Department considered additional membership lists of the claims organizations that the Miamis submitted after the proposed findings. The lists didn't allow the Department to tell the extent of involvement by listed persons, though, and the Department's view was unchanged.

Today, the Miamis' governing body consists of council members usually chosen by the council itself. The Department was concerned that members of an apparently self-perpetuating council had minimal contact with the family group each purported to represent, and that there was no indication that subgroup members knew of or supported the member's role on the council. Weak subgroup distinctions existed for a few people, but the subgroups generally were important to the tribe members only as matters of personal history. The Miamis' new information didn't address that concern, leaving the Department un-

aware of the size of constituent subgroups, and unaware of any existing communication process between the leaders and members. The Department found no evidence, for example, of constituent communication to the leadership on matters such as potential conflicts about bingo and economic development. Communication seemed to consist entirely of semi-annual meetings and a monthly newsletter sent to some (though not all) tribal members. The Department found that the Miamis had not shown a bilateral political relationship.

The Department considered the annual reunion as evidence of political authority, but found that the members of the tribe viewed the reunion as a social occasion.

The administrative record contains a comparison of the Miamis' evidence of community and political authority (which the Department saw as much weaker) and evidence presented on those issues by tribes that petitioned successfully for acknowledgment. That comparison described the Tunica–Biloxi (which was thought to have presented the weakest successful case) as having presented stronger evidence of community, political influence and historical background. The Tunica–Biloxi had, until 1976, a chief with a following and authority. The comparison found the case of the Gayhead Wampanoag to be stronger than the Miamis with respect to informal social contact, distinctions between tribe members and others, marriage patterns, clear territory, geographic concentration, social contact within the tribe (including nonresident members), and political association.

### C.

▆▆▆ A court's review of decisions entrusted to administrative agencies is deferential and thus very limited in scope; the court inquires whether the decision is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence in the case, or not in accordance with the law.

*Howard Young Medical Center Inc. v. Shalala,* 207 F.3d 437, 441–442 (7th Cir. 2000); *see also Diaz v. Chater,* 55 F.3d 300, 305 n. 1 (7th Cir.1995); 5 U.S.C. § 706(2)(A), (E). The court looks for consideration of relevant data, a satisfactory explanation of the decision, and a rational connection between the facts the agency found and the decision it made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). This standard doesn't leave the agency's decision free of review, *see Citizens to Preserve Overton Park,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), but the courts accord the agency's decision a high degree of deference, *see Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Courts don't reweigh the evidence or substitute their own judgment for that of the administrative agencies to which Congress has committed a decision. *See Jancik v. HUD,* 44 F.3d 553, 556 (7th Cir.1995).

■ An agency's action is not "arbitrary or capricious as long as 'the agency's path may be reasonably discerned.'" *Mt. Sinai Hosp. Medical Center v. Shalala,* 196 F.3d 703, 707 (7th Cir.1999) (quoting *Bagdonas v. Dep't of Treasury,* 93 F.3d 422, 426 (7th Cir.1996); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). If the agency relied on factors Congress didn't intended it to consider, or failed entirely to consider some important factor, ·or if the agency's explanation for its decision runs counter to the evidence before it or is so implausible that it can't be ascribed to a difference in view or the product of agency expertise, the decision is arbitrary and capricious. *Mahler v. U.S. Forest Service,* 128 F.3d 578, 582 (7th Cir.1997).

## II.

In Count 4 of its amended complaint, the Miamis assert that the final determination against acknowledgment in 1992 was arbitrary and capricious for several reasons. They say the Department should have presumed interaction for purposes of its community and political authority inquiries, rather than requiring proof of actual interaction. The Miamis believe the Department failed to consider important evidence on some points, and just got the data wrong on other matters. The Miamis view the absence of records with respect to the request for policy guidance from the Assistant Secretary for Indian Affairs renders the Department's decision-making process inexplicable and irrational.

### A.

■ The Miamis say the Department's geographic concentration analysis was based upon an erroneous interpretation of the regulations, didn't take important data into account, and contravened the Department's analyses in other cases.

In 1989, the Department contracted out preparation of the anthropological and genealogical reports on the Miami petition. This wasn't the Department's first use of hired researchers, but it was the Department's first experience with contract preparation of technical reports under the acknowledgment regulations. Under the contract, the Department was to establish the research plan and target the petition's areas of weakness for supplemental research. The anthropologist, Dr. Susan Greenbaum, was to prepare a "description and analysis ... not a general ethnography." Dr. Greenbaum interviewed twenty-nine tribal members and submitted a partial draft anthropological report. After a brief interruption of the contractual relationship, Dr. Greenbaum prepared a final report; a week later, the Department issued its proposed findings against acknowledgment.

The Department asked Dr. Greenbaum to create a map of the geographical distribution of the Miamis' current membership. She found 44.8% of the current Miami membership resides in the geographic core

that Dr. Greenbaum described as catchment areas located in northern Indiana, and illustrated what the Miamis see as remarkable clustering of contemporary members in their subgroup's historic area. The Department concluded that the core geographic area wasn't a social core area; it found "some, but not substantial" social interaction with persons within the geographic core with whom no close kinship relationship existed. The Miamis think the Department's findings ignored the link Dr. Greenbaum found between the present residential pattern and the tribe's historic location.

The Department eventually broadened its view of five counties rather than four (adding Allen County to the Counties of Miami, Wabash, Huntington, and Grant, although the primary demarcation was zip code rather than county). The Miamis contend that the Department dramatically changed the analysis by using county lines instead of historic sites to define the geographic core. The county line methodology excluded from the geographic core Meshingomesia descendants who comprise 86% of the Miamis in St. Joseph and Elkhart Counties. Their inclusion would, the Miamis say, undermine the Department's conclusion that 42% of the tribal members had no immediate kin in the geographic core.

The Department's use of the geographic information was not arbitrary or capricious. As the Department employs it, geographic analysis gives rise to a presumption of interaction if half the petitioner's members live in village-like settings that are predominantly Indian in character; otherwise the petitioner must demonstrate actual interaction, regardless of population concentration. The Miamis don't claim to live in village-like settings, but contend that their population concentration, centered in ancestral areas, should suffice as proof of interaction. The adoption of presumptions is a matter for the agency rather than for the petitioner. The Department can't simply ignore logical inferences

(as distinct from presumptions) from the record, and it didn't do so here: in the final determination, the Department decided that the population concentration in the "core geographical area" wasn't enough to support an assumption that significant social interaction was occurring. That is not an unreasonable finding based on this record.

1.

The Department viewed the Miamis as having misunderstood criterion (b) of the regulations by thinking that a petitioner only had to show that its members live near enough to each other to allow for interaction. The Department viewed the regulation as requiring evidence of actual (not just potential) interaction. The Miamis argue that the Department's reading of the regulation is clearly erroneous. The court disagrees. The Guidelines that accompanied the 1978 regulation explained, "the petitioning group should demonstrate that a sizeable number of its members live close enough to each other to meet, associate, and conduct tribal business on a regular basis, and that they do so .... Also, the community should be of such a nature that it is viewed by itself, and others, as American Indian and distinct from other populations living in the same area." The Miamis's interpretation requires the phrase "and that they do so" to be ignored; it is not unreasonable for the Department to decline to ignore a regulatory provision.

The Miamis say the regulations allow "community" to be presumed from sufficient geographic concentration, and that such a presumption was drawn in the case of the Snoqualmie tribe. The Department agrees that in the Snoqualmie case, a presumption of social relationships for a limited period of time was based on individuals' previous residences in distinct communities; the Department notes that it made a similar presumption in the Miami case, but that the time for which that presumption was made expired before 1940.

In any event, the Miamis say, they presented evidence of actual interaction. The Department thought the Miamis' evidence insufficient because it was anecdotal rather than sufficient, but the Miamis say the Department accepted anecdotal evidence in every other case and declined an opportunity to obtain more systematic data about the Miamis.

The Department wasn't arbitrary or capricious in its interpretation of the regulation, or in its finding that the Miamis did not satisfy criterion (b). An agency decision ordinarily isn't arbitrary and capricious if the court sees that the agency considered the relevant data and explained its decision, and the court can identify a rational connection between the agency's factual findings and its decision. *See Howard Young Med. Ctr. Inc. v. Shalala,* 207 F.3d 437, 441–442 (7th Cir.2000).

It wasn't unreasonable for the Department to have found, based on the record before it, that virtually all interaction from 1940 took place between close kin and members of immediate families, and that interaction between people in different kin groups or social subdivisions were few and limited. The Department credited evidence that Miamis knew little of (and didn't keep up social ties with) other Miamis not in their immediate family, especially Miamis who had moved away from the geographical core; the Department was well within its discretion in doing so. The record also supports the Department's conclusion that the Miamis didn't show that they were seen as distinct, given the lack of post–1940 distinct social institutions or cultural beliefs. The Department's conclusions had a rational basis, and don't need to be the same conclusions the court might have reached. *Pozzie v. United States Dep't of Housing and Urban Dev.,* 48 F.3d 1026, 1029 (7th Cir.1995).

### 2.

The Miamis compare their "geographic core" submissions to those in the Mohegan tribe's acknowledgment petition, which the Department granted after re-analyzing the tribal members's geographic concentration and concluding that certain facts—the number of tribal members resident in the core area, defined as a ten-mile radius around the tribe's historic settlement; the number of members born in, but no longer resident in, the core area; the number of members related to a core area resident; and actual evidence of non-resident participation in core activity—demonstrated significant social connection to the tribe's core area and so amounted to evidence of community. The Mohegan petition proceeded through the Department about the same time as did the Miami petition.

The Miamis say the Department itself performed this calculation in the Mohegan case, and that such an analysis shows the Miamis' community to be comparable to that of the Mohegan. The Miamis say that if only one of their secondary settlement areas were added to the core area, their numbers would be nearly identical to those for Mohegan. The Miamis note that the Branch of Acknowledgment and Research staff considered the Miamis' evidence of social contact and internal political processes to be stronger than that of the Mohegans.

The Miamis' argument would be stronger had the Department presumed social interaction from the facts common to the two petitions, but no such presumption was employed in the Mohegan case. After considering evidence of kinship, actual interaction, cross-family group attendance at Mohegan funerals and weddings, migration back to Mohegan Hill, and a clustering of residences in a small area, the Department found that social interaction among the Mohegan was actually occurring. Even if the Branch of Acknowledgment and Research staff's views indicate that the decision wasn't unanimous, the court can't find the Miami decision to have been arbitrary and capricious simply because different evidence led to a different conclusion in the Mohegan case.

B.

The Miamis also say the Department passed up the chance to put together the data it wanted as proof of community, and that the Department ignored key evidence of community. The Department identified contemporary community and political authority as issues that needed supplementation as early as 1985, but didn't suggest then that the Miamis do an ethnographic study. The Miamis understood the Department to say then that it was looking for descriptive evidence ("a more detailed description of and evidence for social distinction of the group . . ." and "more information and/or documentation, if available, concerning reunions, annual picnics, and the like"). The Miamis responded with descriptive and anecdotal information.

When contracting with Dr. Greenbaum, the Department made clear that she was not to do "a general ethnography." The Department declined Dr. Greenbaum's proposal to mail questionnaires to tribal members (the Department preferred interviews). Dr. Elizabeth Glenn offered, on the Miamis' behalf, to perform a systematic study of the community, but the Miamis say the Branch of Acknowledgment and Research recommended against such a study because too little time was left to do it. The Miamis argue that the Department's rejection (for want of underlying data) of the Miamis' anecdotal information is arbitrary and capricious in light of its having declined those offers, especially since the Miamis believe their methodology (generalizing about the nature of group dynamics from interviews of key informants) is accepted as standard in anthropology, and in light of the virtual impossibility of documenting a predicted 4.5 million social ties. The Miamis also understand the Department to have required each tribal member to maintain "significant social contact" with half the Tribe, or more than 2,000 people—a level of sociability the Miamis consider unreasonable.

The Miamis oversimplify their communication with the Department, which appears to have been trying to suggest the sort of specific information that could be combined to establish significant social ties among the Miamis. The Miamis submitted a research plan for documenting discrimination, unique cultural traits, interaction, and contact across family lines; the plan spoke of searching newspaper articles and at least 10 days of field interviews. The court, mindful that the regulations place the burden of proof on the people petitioning for acknowledgment, does not agree with the Miamis that the Department's research suggestions rendered its ultimate decision arbitrary or capricious. That the Miamis might have presented more evidence doesn't make the Department's actions arbitrary or capricious, as long as the Department didn't refuse to consider evidence or data the Miamis offered.

1.

The Miamis argue that the Department ignored data, even if it can't properly be said that the Department refused to consider it. The Miamis say that to reach its conclusions about the diffuse kinship ties among contemporary Miami resulting from the outmarriage, the Department ignored two sets of data that show the Miami are highly interrelated.

First, Dr. Greenbaum reported that more than 75% of the modern membership claims ancestry from more than one of the list ancestors (those who resided in settlements traditionally occupied by certain Miami subgroups), and several list ancestors have more than 100 descendants in the contemporary Miami membership, producing multiple horizontal and vertical kinship ties. The Department, in contrast, found that few close kinship ties existed between, as opposed to within, family lines. The Department did not ignore Dr. Greenbaum's figures in reaching that finding; the Department reasoned that the kinship rate reflected the intra-tribal marriage rate of more than 50% for tribe members born between 1837 and 1864 (that marriage rate dropped to around 10% for later

generations), and that when so viewed, today's kinship rate tells nothing about the existence of close contemporary ties conducive to interaction.

Second, the Miamis say the Department ignored the list ancestors' life spans when it said the modern day Miami are three generations removed from the list ancestor; Dr. Greenbaum reported that the bulk of the adults in the contemporary Miami membership are grandchildren of list ancestors who were on the 1895 list. If so, this difference doesn't undermine the Department's ultimate finding with respect to actual interaction.

### 2.

The Miamis challenge the Department's conclusion that there were "no cultural differences between the Miamis and the surrounding population." Dr. Greenbaum reported that the last fluent Miami speakers died in the early 1960s, and that pageants, powwows; and the use of traditional costumes were performed continuously at the annual reunion after the 1940s. Dr. Greenbaum described the annual reunion (conducted every year since 1903) as serving "as an occasion for socializing and an opportunity to discuss legal and political issues affecting the tribe as a whole."

Department staff anthropologist Dr. George Roth noted things about the Miami reunions that distinguish them from Midwestern family reunions—the Miami reunions were said to be broader, limited in attendance, and marked by "Indian music or other Indian cultural demonstrations or sources of information, and announcements of matters relating to 'tribal business.'" Nonetheless, Dr. Roth concluded that no cultural differences (*e.g.*, religious beliefs or behavioral standards) distinguished Miami reunions from non-Miami reunions.

The Department concluded that the annual half-day event, attended by just 3.5% of the members, wasn't enough of an indicator of significant social interaction among the Miami membership to demonstrate criterion b. There is nothing incon-

sistent between that finding and Dr. Greenbaum's report; a comparatively small fraction of the descendants of the Miami tribe can celebrate their heritage for a few hours a year without making the tribe distinct from others in the area.

### C.

■ The Miamis contend that the Department acted arbitrarily and capriciously by looking for bilateral political relations since the 1940s when deciding whether the Miamis' petition satisfied criterion (c); the Miamis contend that the regulation—"A statement of facts which establishes that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present"— contains no such requirement. The Miamis say that until the term "bilateral political relations" popped up in their case, other acknowledgment petitioners generally satisfied criterion (c) by identifying a continuous line of leaders, whether selected formally or informally, and providing examples of those leaders' activities on the tribe's behalf.

In *Masayesva v. Zah*, 792 F.Supp. 1178 (D.Ariz.1992), the court upheld the department's use of the phrase "bilateral political relations" in defending its approach to determining who was a member of the San Juan Southern Paiute tribe and who was a member of the Navaho Nation. The Miamis say that since their petition doesn't involve a person being claimed as a member of two tribes (such people comprised about 63% of the San Juan Southern Paiute membership), there was no need to conduct any inquiry in bilateral political relations. Doing so, the Miamis say, was arbitrary and capricious.

The Department responds that "bilateral political relations" means exactly the same thing as criterion (c). The regulation's terms "influence" and "authority" posit a bilateral relationship—two sides and relations between them. The regulations supply the term "political." The De-

partment also notes that this wasn't the first time the "bilateral political relations" terminology came into play, and it cites its resolutions of acknowledgment petitions by the Cowlitz and Chinook tribes.

The Department has a limited right to construe its own regulations, *Adventist Living Centers. Inc. v. Bowen*, 881 F.2d 1417, 1420–1421 (7th Cir.1989), and the court can find no reason not to defer to this construction of criterion (c). "Bilateral political relations" is not an unreasonable synonym for "tribal political influence or other authority."

### 1.

The Godfroy council was active after the 1940s in addressing matters related to claims on the Tribe's behalf against the United States and efforts to protect Miami cemeteries. The Department thought the Godfroy council only represented one subgroup. The Miamis say the Department was simply wrong in its understanding, and that as time went on, it included members of the Bundy, Mongosa, and Richardville/Lafontaine families as well as the Godfroy family. Those folks all were related to the Godfroys, too, but the Miamis say that just shows they were members of the same tribe.

The Miamis say the Department was wrong in its understanding that the Godfroy council tried to keep other subgroups from sharing in the claims award the tribe eventually received from the United States: the Godfroy council spoke for the tribe in rejecting a settlement offer, and insisted in 1947 that eligibility for the claims should be based on descent from the 1895 list ancestors. The Miamis also argue that the Department irrationally used the subgroup conflict that surrounded the Godfroy council inconsistently—as evidence that tribal-wide political influence didn't exist after the 1940s, but as evidence of the tribe's political processes before 1940, when subgroup leaders were found to have shared power and acted jointly only when necessary. The Department, the Miamis say, didn't place its political

authority analysis in the overall tribal historical context, as the regulations require the Department to do. 25 C.F.R. § 83.1(i) (1982).

The Department concluded that subgroup activity was different before 1940 than after. The factors supporting the finding of political authority before 1940 included subgroup conflicts. Although tribe members' sentiments often were mobilized along subgroup lines, there were leaders with significant followings, who dealt with subjects of importance to a broad spectrum of the membership. The Department concluded that after the early 1940s, the conflicts between the subgroups were important only to the officers of the organizations, and by 1979, subgroups were of limited importance to all but some core members active in council affairs. The Department found little persuasive evidence that subgroup conflict was a matter of concern to many members. The final determination concluded that "it appears that council members have almost no political contact with the kin group they are considered to represent except for the portion most closely related to them. This fact is critical because the degree of informal social contact among the membership at large is limited." That finding has ample basis in the record, even if the record also might be read differently.

### 2.

The Miamis say they gave the Department two examples of post–1940 decision-making of a political nature. The Godfroy council voted in 1957 to accept the federal government's settlement offer concerning the tribe's claims. Sylvester ("Ves") Godfroy overrode the vote and rejected the offer; his decision withstood what the Miamis report was strong opposition from Meshingomesia leaders. The Miamis also point to a power struggle in the 1960s when Ves Godfroy died. That struggle, they say, wouldn't have happened if there were no political influence at stake.

The Miamis offer a reasonable inference from those historical moments, but theirs is not the only reasonable inference. The Department concluded that two instances of decision-making didn't demonstrate a method of addressing with group problems, making group decisions, enforcing them, and controlling and influencing the group—components of political authority within the contemplation of criterion (c). The Department's view is no less reasonable than that offered by the Miamis, and the choice between reasonable views of the record belongs to the Department, rather than to the court.

### D.

The Miamis argue that the Department's process was so flawed as to make its decision arbitrary and capricious. They say the Department has left unexplained the 1992 request for policy guidance and the response to that request. The Branch of Acknowledgment and Research staff thought the case a close one and sought help from the Assistant Secretary for Indian Affairs, after which they recommended against acknowledgment. The record doesn't explain what happened at what the Miamis see as the determinative point in the process. They cite *Building & Constr. Trades Dep't. AFL–CIO v. Martin,* 961 F.2d 269, 277 (D.C.Cir.), *cert. denied* 506 U.S. 915, 113 S.Ct. 323, 121 L.Ed.2d 243 (1992) for the proposition that this lack of explanation makes the Department's final decision arbitrary and capricious.

The court disagrees. The *Building & Construction Trades* case tells us that had the Branch of Acknowledgment and Research staff's request for help been followed by a conclusory denial of the acknowledgment petition, the decision would have been arbitrary and capricious, but it would have been so because of the absence of a reasoned basis for the decision, not because a group of people within the agency sought the views of a superior in the agency. For staff to seek the views of a superior when confronting what the staff see as a close case seems the antithesis of arbitrary and capricious decision-making.

The Miamis say the use of contractors on an unprecedented scale fundamentally flawed the process. As examples, a proposed finding was published when no Department staff anthropologist had made a formal, on-site visit, and the Department staff anthropologist reported on contemporary political authority without a separate analysis of contemporary community. The Miamis also point to what it sees as several disagreements between the findings and Dr. Greenbaum.

Those disagreements, though, are simply occasions of the Department performing its administrative duty of deciding whether a petitioner satisfied each criterion of the acknowledgment regulations—a duty not contracted to Dr. Greenbaum or anyone else. The Miamis cite nothing from Dr. Greenbaum that was not included in the administrative record; instead, the Miamis disagree with respect to the weight the Department gave to favorable data from Dr. Greenbaum. The Department weighed her data, which is what it is supposed to do; it simply weighed it differently than the Miamis would weigh it. The record contains ample basis for the Department to have weighed it as it did: BIA researchers found conflicting, unsubstantiated and inadequately supported conclusions in Dr. Greenbaum's reports. Her work was read carefully and discounted somewhat, not ignored.

Indeed, while no staff anthropologist made a formal site visit, the Department had Dr. Greenbaum review the report for consistency with her data and field work; she reported none.

The Department says a petitioner meets its burden of proof "if the evidence available establishes a reasonable likelihood of the validity of the facts relating to the criteria," but the Miamis say the Department demanded from them substantial evidence, clear cut proof, and strong evidence

of the criteria. The Miamis also see the Department as having required of them (but not of other petitioners) a systematic, ethnographic study, and as having failed to use a simpler (and outcome-determinative) inquiry it used in the Mohegan case. An ethnographic study might have strengthened the Miamis' case (though this assumes, as the Miamis seem to assume, that such a study would have help prove, rather than disprove, community), but that doesn't mean that the Department required such a study. The Department considered the Miamis' submission and found it insufficient. The Department simply required more than what the Miamis offered (perhaps, more than what the Miamis could have offered), which is inherent in any weighing of evidence. The Department is supposed to weigh the evidence. The court's reading of the record doesn't leave the court with the belief that the department held the Miamis to any higher standard of proof than it said it was.

The Miamis say the Department ignored some of its own regulations. The Miamis say the Department overlooked a surge in tribal activity in 1979, notwithstanding the regulation that "A petitioner shall not fail to satisfy any criteria herein merely because of fluctuations of tribal activity during various years." 25 C.F.R. § 83.7(a) (1982). This argument would require the court to misread the Department's findings. The Department found that there was insufficient evidence of bilateral political relations from the 1940s to 1979, and from 1979 to the date of the report. The Department was not arbitrary or unreasonable in failing to think that a half century was a "fluctuation" of tribal activity.

The Miamis say the Department's analysis suggests that the Miamis would have to elect their leaders formally to satisfy the perceived requirement of bilateral political relations, but the Miamis didn't historically engage in formal elections, and 25 C.F.R. § 83.1(i) provides that political processes "must be understood in the context of the Indian culture and social organization of that tribe." The previous discussion of the subgroups and the Godfroy council shows that the Department considered the Miamis' historical methods of self-governance. Nothing in the Department's decision suggests a requirement of formal elections; the Department was looking for a relationship between the leaders and a substantial portion of the membership, on topics that had more than passing importance to a substantial portion of the membership.

The Miamis contend that some of the points the Department addresses in its submissions in this case—such as whether half the tribal members are married to tribal members, whether the tribal members speak a native language or practice a native religion, whether half the tribal members live in a village setting—aren't found in the 1978 regulations (though in the 1994 revisions such issues raise presumptions, but are not requisites). The 1994 regulations, though, were intended to codify the Department's existing practices. Had these considerations been in the 1978 regulations, that part of the 1994 codification wouldn't have been needed. The Miamis don't argue that these matters can't be considered consistently with the 1978 regulations, and such an argument wouldn't be persuasive in any event.

E.

For the reasons set forth above, the Department is entitled to judgment as a matter of law with respect to Count 4 of the Miamis' amended complaint.

III.

 In 1994, Congress amended the Indian Reorganization Act, prohibiting federal agencies from classifying, enhancing, or diminishing the rights of any federally recognized Indian tribe relative to other federally recognized tribes. Indian Reorganization Act of May 31, 1994; Pub.L. 103–263, 108 Stat. 707, 709 (codified at 25 U.S.C. § 476(g) (1995 Supp.)). The Department declined to reconsider the Miami

petition for federal acknowledgment under the 1994 revisions to the acknowledgment regulations and declined to set aside the 1897 withdrawal of administrative acknowledgment in light of the 1994 amendment to the Indian Reorganization Act. The Miamis claim in Count 5 of their amended complaint that they could have changed the Department's decision had their petition been considered under the 1994 revised regulations.

The Miamis claim that since they were once acknowledged by treaty, they are entitled to what the Miamis see as a lighter burden provided for previously acknowledged tribes in the 1994 regulations. Previous acknowledgment is established by "evidence that the group has had treaty relations with the United States." 25 C.F.R. at § 83.8(c)(1) (1994).

The Miamis believe the 1994 regulations present a lighter burden because a previously acknowledged tribe has to prove the criteria for shorter time periods: since the last federal acknowledgment for Indian identity, 25 C.F.R. § 83.8(d)(1) (1994), and for the present for distinct community and political authority or influence. 25 C.F.R. § 83.8(d)(2), (3). Political authority can be shown by "substantially continuous historical identification, by authoritative, knowledgeable external sources, of leaders and/or a governing body who exercise political influence or authority, together with demonstration of one form of evidence listed in § 83.7(c)." 25 C.F.R. § 83.8(d)(3). The Department itself spoke of a "streamlined demonstration of criterion (c)" in explaining the revised regulations. 59 Fed. Reg. 9282. The Miamis point to acknowledgment petitions processed under the 1994 regulations, such as those of the Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan and the Cowlitz Indian Tribe, as proof that a lesser showing is required.

The Miamis had no right to any reevaluation under the 1994 regulations, because the 1994 regulations don't apply to a petitioner that was denied acknowledgment under the 1978 regulations. 25 C.F.R. §§ 83.3(t) ("groups that previously petitioned and were denied Federal acknowledgment under ... previous regulations in part 83 of this title, may not be acknowledged under these regulations."); 83.10(p) ("A petitioner that has petitioned under this part or under the acknowledgment regulations previously effective and that has been denied Federal acknowledgment may not re-petition under this part.").

The Department maintains that a court is not to construe a regulation as having retroactive effect unless the regulatory language so requires. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). The Miamis disagree; they say this case is nothing like *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), which addressed a decision not to prosecute and a governing statute that provided no meaningful standard for review, and that in any event, a presumption against reviewability is rebuttable when meaningful standards can illuminate judicial review. *See Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir.1985); *California Human Dev. Corp. v. Brock,* 762 F.2d 1044, 1049 (D.C.Cir.1985); *Center for Auto Safety v. Dole,* 828 F.2d 799, 803 n. 7 (D.C.Cir.1987).

It appears to the court that both sides have overstated somewhat the support their authorities provide for their position, but it also appears to the court that sorting out each principle of retroactivity and judicial review isn't necessary. The Miamis don't argue that the Department had no authority under the 1994 amendments to the Indian Reorganization Act, to adopt a regulation specifically providing for non-retroactivity, and it is enough to say merely that the 1994 regulation makes itself inapplicable to the Miamis' petition.

The Miamis also contend that the Department's stated policy goals of uniformity and consistency provide meaningful standards for judicial review of a decision not to apply the 1994 regulation retroac-

tively. The Miamis stress that they do not seek to file a new petition (a course closed by §§ 83.3(f) and 83.10(p)), but rather seek the Department's reevaluation of its data under the 1994 provisions for previously acknowledged tribes. The Miamis don't explain why reevaluation differs procedurally from repetitioning, but they say consistency and uniformity support their request, since the 1994 regulations were first published only three months after the Miamis filed their rebuttal asking for application of unusual standards. Retroactivity is not a meaningful impediment, the Miamis say, when changes that only clarify are made.

 A clarifying regulation ordinarily is not retroactive. *Pope v. Shalala,* 998 F.2d 473, 483 (7th Cir.1993), *overruled on other grounds by Johnson v. Apfel,* 189 F.3d 561 (7th Cir.1999). The drafters of the 1994 regulations said the new regulations were meant simply to codify existing practice concerning standards of evidence, and disclaimed any intention to make substantive modifications that would change outcomes, as explained in the preamble ("None of the changes made in these final regulations will result in the acknowledgment of petitioners which would not have been acknowledged under the previously effective acknowledgment regulations. Neither will the changes result in the denial of petitioners which would have been acknowledged under the previous regulations."). Courts ordinarily give great weight to an agency's declaration that a regulation clarifies existing law rather than changing it. *First Nat'l Bank of Chicago v. Standard Bank & Trust,* 172 F.3d 472, 478 (7th Cir.1999).

For these reasons, the Department did not act unreasonably, arbitrarily or capriciously in refusing to apply the 1994 regulations to the Miamis' pre-1994 acknowledgment petition. Further (perhaps precisely because the 1994 regulation clarified the law rather than changing it), it appears that the Miamis would fail even under the 1994 regulations, be-

cause § 83.8(d)(3) (1994) would require them "to demonstrate political influence or, authority is exercised within the group at present"—on which they came up short under the 1978 regulations. That determination, of course, would be up to the Department rather than to this court, and the Miamis simply say the Department should have to consider their claim under the newer regulations.

The Department articulated its reasons for declining to reconsider the Miamis' petition under the 1994 regulations and, especially given the regulatory language and the general presumption against retroactivity, *see Bowen v. Georgetown Univ. Hosp.,* 488 U.S. at 208, 109 S.Ct. 468, the Department's denial of reconsideration under the new regulation was not arbitrary or capricious.

The Department is entitled to judgment as a matter of law with respect to Count 5 of the Miamis' amended complaint.

## IV.

 The Miamis contend in Count 6 of their amended complaint that the Technical Corrections Act of 1994, Pub.L. No. 103–263, 108 Stat. 707, amending section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 476(g), nullifies and invalidates Assistant Attorney General Van Devanter's 1897 opinion on the Miamis' tribal status. From 1854 until 1897, the federal government "interacted with the Indiana Miamis as covered under the United States' trust responsibilities," *Miami Nation of Indians of Indiana, Inc. v. Lujan,* 832 F.Supp. 253, 255 (N.D.Ind.1993), but the Department of the Interior withdrew acknowledgment of the Miamis in Indiana and has refused to acknowledge the Indiana Miamis as an Indian tribe since 1897. *Id.* at 255. In an earlier ruling in this case, the court held that the statute of limitations barred the Miamis' challenge to that decision, and rejected the Miamis' contention that the Department had a continuing duty to acknowledge the

Miamis' tribal status. *Id.* at 253. When the Miamis sought reconsideration of their petition under the 1994 revised regulations, they also sought a determination that the 1994 revisions to the IRA set aside the 1897 administrative termination; the Department denied that request, as well.

The Miamis explain that they once were a recognized tribe, having been acknowledged, as they see it, by formal treaty in 1854. In furtherance of that contention, the Miamis note that from 1854 to 1897, Congress appropriated annual interest payments to the Miami pursuant to the 1854 treaty, paid and investigated other claims, appropriated reimbursement payments, directed the Interior Secretary to list Miamis entitled to annuity payments under the treaties, was told by the Department that the Miamis were "fully and unqualifiedly recognized by the government of the United States," and acknowledged the 1854 treaty with the Miamis a Senate Committee report on Indian Affairs on the Miamis' claims against the United States.

The history of the Miamis' dealings with the Department as a tribe, set forth at *Miami Nation,* 832 F.Supp. at 254–255, came to an end in 1897. After the Miamis won a court decision against the State of Indiana's efforts to tax Miami lands, *Wau-Pe-Man-Qua Alais Mary Strack v. Aldrich,* 28 F. 489 (D.Ind.1886), the Miamis asked the federal government for help in recovering real estate taxes already paid. The request didn't turn out as the Miamis had hoped. Assistant Attorney General Van Devanter decided that the Miamis in Indiana were not maintaining tribal relations, and so were no longer a tribe subject to the United States' trust responsibilities. The Department terminated administrative acknowledgment of the Miamis.

What happened in 1897, the Miamis say, was illegal. The Department doesn't have the authority to terminate the inter-governmental relationship between an Indian tribe and the federal government, *see United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913); *Tiger v. Western Investment Co.,* 221 U.S. 286, 315, 31 S.Ct. 578, 55 L.Ed. 738 (1911); *Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975), but the Department has (in the Miamis' view) steadfastly disregarded the Miamis' acknowledgment for a century. The Miamis say the 1994 amendment's literal language precludes such treatment:

> Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

Pub.L. 103–263, § 5(b), 108 Stat. 709 (codified at 25 U.S.C. § 476(g)). This language, the Miamis say, sets aside the Departments refusal to acknowledge them based on the 1897 Van Devanter opinion. That refusal, they say, was an administrative decision in effect on May 31, 1994 (and so governed by the 1994 amendment), and diminished the Miamis' privileges and immunities as a federally recognized tribe in comparison with other federally recognized tribes. Accordingly, the Miamis reason, the amendment renders that administrative decision of no effect. If the Miamis are correct in this, the Department cannot require the Miamis to proceed through an acknowledgment petition process: Congress would have negated the Department's attempted dis-acknowledgment of the Miamis.

Congress did not nullify the 1897 decision. The Technical Corrections Act only applies to recognized tribes, not to all groups of people that ever had been recognized as a tribe. The Department came to the same decision, and its construction of its governing statutes is entitled to deference (though the court reaches the same reading independently, as well). *See Food*

*and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 1300–1301, 146 L.Ed.2d 121 (2000); *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984); *Baltimore Gas and Elec. Co. v. NRDC*, 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The Miamis simply are not a recognized tribe.

The Miamis say there is a difference between not being acknowledged by the Department of the Interior and not being acknowledged by the United States; the Miamis reason that since Congress never terminated their acknowledgment or authorized the Department to do so, they were still acknowledged by the United States when the 1994 amendment took effect. Congress, though, knew the regulatory difference between tribes "once recognized and no longer recognized," and those "never before recognized," *United Houma Nation v. Babbitt*, Civ. No. 96–2095(JHG), 1997 WL 403425, at *8 (D.D.C. July 8, 1997),[1] and didn't include the Miamis in the Federally Recognized Tribes List Act it adopted a few months later, 25 U.S.C. § 479a.

When the 1994 amendment was adopted, this court already had decided that the statute of limitations bars the Miamis' claim in Count 1 that they are still recognized because the 1897 decision lay outside the Department's authority. *Miami Nation*, 832 F.Supp. at 256. The Department argues that the arguments in Count 6 are barred by that holding. The court believes the Department attributes more preclusive effect to that holding than the law allows; due to the trifurcation to which the parties agreed (and, concededly, to the time the court has needed for ruling at each stage), the court's decision on Count

1 is not even appealable yet. The court is free to reconsider that decision pending final judgment.

Nonetheless, the ruling on Count 1 (interlocutory though it may be) becomes important for two reasons. First, in any quest for Congressional intent, the decision's existence makes it less likely that Congress intended to do what the Miamis could not do—set aside the Department's decision that the Miamis were not federally recognized—without mentioning a word of that intent. The Miamis simply were not federally recognized when Congress acted, and Congress didn't write a statute that applied to them or changed their status. Congress was free, the court assumes, to decide in 1994 that the Miamis should be federally recognized, but if Congress meant to do so, the 1994 amendment didn't accomplish it.

Second, the court sees no reason to set aside its decision on Count 1. The Miamis haven't expressly asked the court to do so, but in any event, the court can't agree with the Miamis' arguments on Count 6 without addressing Count 1 anew. The court recognizes its authority to revisit what remains an interlocutory ruling on Count 1, but the court remains persuaded that its ruling on Count 1 was correct.

The 1994 amendment to the Indian Reorganization Act did not restore or reaffirm the Miamis' federal recognition. The Department did not act unlawfully when it refused to set aside its 1897 decision with respect to the Miamis.

## V.

A decision that a once-extant tribe has ceased to exist in the United States is an historic event; a governmental finding that a group of people with common tribal de-

---

1. The Department implies some sort of claim preclusion based on the court in *United Houma Nation v. Babbitt* having ruled against the party represented by the attorneys who represent the Miamis here. The court knows of no authority for such an estoppel-by-choice-of-

counsel doctrine. Nonetheless, while the *United Houma Nation* opinion is in no sense controlling authority, the court finds its reasoning persuasive to the extent it applies to this case.

scendants are not, for purposes of the laws of the United States, members of an existing tribe has profound meaning. Such decisions should not be made lightly, and the decisions in this case were not made lightly. The Department considered and reconsidered, and this court has allowed the parties to proceed on a cautious, lengthy course of administrative review. After that review, the court is satisfied that the Department's findings have sound support in the record, and its explanations for its decisions are clear and logical. The Department is entitled to summary judgment on all remaining counts. The court GRANTS the defendants' motion for summary judgment (filed December 3, 1999, docket # 191), DENIES the plaintiffs' motion for summary judgment (filed December 3, 1999, docket # 193), and DENIES the plaintiffs' motion for oral argument (filed December 3, 1999, docket # 195). The clerk shall enter judgment for the defendants.

SO ORDERED.